[Cite as *Evans v. Evans*, 2013-Ohio-4238.]

IN THE COURT OF APPEALS FOR CHAMPAIGN COUNTY, OHIO

MARTIN D. EVANS                           :

     Plaintiff-Appellee                    :            C.A. CASE NO.     2012 CA 41

v.                                        :            T.C. NO.     00DR238

SONYA S. EVANS, et al.                    :            (Civil appeal from Common
Pleas
                                                       Court, Domestic Relations)

     Defendant-Appellant                   :

                                          :

        . . . . . . . . . .

**O P I N I O N**

Rendered on the _____27th_____ day of _____September_____, 2013.

. . . . . . . . . .

MARTIN D. EVANS, 4792 Parkwick Drive, Columbus, Ohio 43228
     Plaintiff-Appellee

STEVEN R. FANSLER, Atty. Reg. No. 0000644, 212 N. Detroit Street, P. O. Box 764,
West Liberty, Ohio 43357
     Attorney for Appellees James and Litha Parker

JAY M. LOPEZ, Atty. Reg. No. 0080819, 18 East Water Street, Troy, Ohio 45373
     Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the November 26, 2012 Notice of Appeal of Sonya S. Evans.   Sonya appeals from the October 26, 2012 Decision of the Champaign County Common Pleas Court, Domestic Relations - Juvenile - Probate Division, which designated James and Litha Parker as the legal custodians and residential parents of Sonya's minor child, K.E., who was born June 4, 2000.   The Parkers are K.E.'s maternal grandparents. K.E. also has two brothers, B. E., who was born on August 1, 1993, and G.P., who was 27 at the time the Parkers and K.E's father, Martin Evans, filed their third-party complaint.   Martin and Sonya were divorced in 2001.

{¶ 2}   Martin and the Parkers filed their complaint for custody of K.E. on May 17, 2011.   They alleged that "[b]ecause of recent acts of discipline and/or violence, [the Parkers] have temporary de facto custody of both children and have incorporated them into their household since March 25, 2011."   They further alleged that Martin "is not in a position presently to provide custodial care" for K.E. and B.E.   Also on May 17, 2011, Martin and the Parkers filed Third-Party Plaintiffs' ex parte Motion for Temporary Custody. The Parkers' attached affidavit provides that they "have witnessed the consequences of our daughter, Sonya Evans, physically, verbally and mentally abusing" B.E. and K.E. According to the Parkers, they "have seen a bite mark on [B.E.'s] hand which came from his mother biting him."   They further asserted that Sonya and Dan Weaver "have a relationship which appears dysfunctional to us, and in mid-February Sonya was charged with a domestic violence charge directed against Dan Weaver which happened in the home that they rent from us." The Parkers asserted that they "have served a three-day notice of eviction" on Dan. Finally, the Parkers asserted that G.P. "began residing with [them] at age sixteen while he

was still a high school student and continues to reside with them today at age 27. His reasons for moving in with the Plaintiffs were similar reasons to the complained-of actions in this case." Also attached to the motion is Martin's affidavit, which provides that he does not believe that his children are safe "when they are with their mother, especially when she is involved with Dan Weaver."

{¶ 3}     On May 20, 2011, the trial court designated the Parkers temporary legal custodians and residential parents of K.E. and B.E. The record reflects that B.E. turned 18 years of age on August 1, 2011. The trial court issued a judgment entry that in part granted parenting time to both Martin and to Sonya.

{¶ 4}     On April 11, 2012, an evidentiary hearing was held on the motion for custody. Brandin Marlow, K.E.'s Guardian ad Litem, testified that she believes that K.E. "needs to be involved in counseling, both individual counseling and then family counseling with the focus being on the relationship between [K.E.] and her mother." She stated that when she initially visited Sonya's residence, it "was in very poor condition as far as cleanliness is concerned. Additionally, it did not have adequate sleeping space * * * at least for [K.E.]." Brandin stated that at the time of her visit, Sonya "had a room that would be set aside for [K.E.], but at that time it did not contain a bed and was full of boxes and other assorted things not related to sleeping arrangements." Brandin stated that her initial visit was scheduled, and that Sonya had been in the home for "a few months." Brandin stated that K.E. slept on an air mattress in the laundry room.

{¶ 5}     Brandin testified that Sonya's boyfriend, Dan Weaver, was present twice when she visited Sonya's home. Brandin acknowledged the recommendation in her report

that K.E. spend one-on-one time with Sonya in the absence of Dan during Sonya's parenting time, and she stated that Sonya "did not appear to want to or see a need to have it separated from Mr. Weaver." Brandin stated, based upon her conversations with Sonya, "it was my perception that she believed any issues with the relationship between [K.E.] and Dan were [K.E.'s] fault, [K.E.'s] problem, and something [K.E.] would have to deal with * * * ." Brandin indicated that Sonya prioritized her relationship with Dan over her relationship with K.E. She indicated that, in terms of discipline, Sonya employs physical punishment and also withholds K.E. from the Parkers. She stated that Sonya is "quite resistant to having K.E. in counseling." Brandin stated that Sonya and the Parkers have a strained relationship. She recommended that the Parkers have legal custody of K.E. to serve the child's best interest.

{¶ 6} On cross-examination, Brandin identified pictures of Sonya's home that reflected a bedroom with sufficient space and a bed for K.E. She further identified satisfactory report cards for K.E.'s fifth and sixth grade years. Brandin indicated that Sonya does not have a criminal record in relation to K.E., and that Children's Services has not filed a complaint of abuse, neglect or dependency against Sonya in relation to K.E. Brandin further acknowledged that K.E. participated in extra-curricular activities while in Sonya's care. Brandin stated that K.E. loves Sonya, and that it would be good for K.E. to spend time with her mother. She stated that Sonya and Dan have been in a relationship for several years, and that they have vacationed with K.E. and B.E. Marlow acknowledged that "there have been times" when the Parkers have made it difficult for Sonya to spend time with K.E.

{¶ 7} B.E. testified that Dan joined Sonya's household while he resided there, and

that B.E. left Sonya's home a year ago. He stated that the condition of the home was "terrible," and that he was "embarrassed." He stated that while he lived with Sonya, the family did not have regular meals together, but that he and K.E. ate in their rooms. B.E. stated that he feared Dan, and that he recognized that K.E. did as well. B.E. stated that Dan "always" called him "stupid," and would "tell me that I'm worthless and then he said that he could see me in jail. And then he started calling [K.E.] these names. He was emotionally abusive (unintelligible) and he physically abused her once." B.E. stated that Dan "picked [K.E.] up by her arms and threw her." B.E. stated that he did not receive positive reinforcement from Dan. B.E. testified that Sonya was present when Dan mistreated him and K.E., that she allowed it to happen, and that she did nothing to prevent the harm Dan caused. B.E. stated that K.E should reside with the Parkers because in their home she "eats better. She does better in school. She's got a clean environment. She seems really happy at my grandparents' house." B.E. stated that he resided with the Parkers for a few months, and that in that home the family has regular meals together, while at Sonya's home he sometimes went without meals. He stated that the Parkers can be counted upon to meet K.E.'s needs.

{¶ 8} On cross-examination by counsel for Sonya, B.E. stated that he reported Dan's emotional abuse to his high school guidance counselor, and that following an investigation in early 2011, he and K.E. were not removed from Sonya's home. On cross-examination by Martin, B.E. indicated that Sonya had his cell "phone shut off" when he spoke to his father.

{¶ 9} Martin testified that there was substantial tension between him and the

Parkers after he and Sonya were divorced, until he "contacted them one day and talked to Mrs. Parker and said that we have to put our differences aside of what he have for each other and worry about the kids." When asked who would provide a better life for K.E., Martin responded, "My opinion I feel that the Parkers would * * *." Martin testified that a "year ago in March when I got [K.E.] a temporary restraining order, [K.E.] weighed 40 pounds. She was undernourished. She wasn't eating right. * * * The doctor said she was undernourished. And basically there was times that [K.E.] and [B.E.] called me, and Sonya would not be home." Martin stated that Sonya did not facilitate his parenting time when K.E. resided with her. Martin stated that when he picked K.E. up at Sonya's home, "nine times out of ten * * * she would have filthy clothes on."

{¶ 10} On cross-examination, Martin testified, "When I got them calls from [B.E.] or [K.E.] stating that the mom was screaming and beating up on them again and they was having problems in the house, I and [the Parkers] decided that we was going to get the problems straightened out because my opinion is the kids shouldn't have been treated the way they was treated." Martin stated that he has observed "Sonya smack [K.E.] across the face in front of the Urbana Police Department one night when I dropped her off. I've seen her grab the kids, and I've seen her hit [B.E.] several times." On redirect, Martin described an incident in which the Urbana Police Department and Children's Services responded to Sonya's home, and B.E. was taken to the emergency room after a physical altercation with Sonya. On re-cross-examination, Martin stated that Children's Services found the allegations of abuse unsubstantiated, that Sonya was not charged, and that B.E. "got charges; unruly juvenile."

{¶ 11} Litha Parker testified that Sonya's son G.P. was born in 1983, and that Sonya and he lived in her home after his birth. She testified that Sonya resided with her and her husband off and on for periods of up to three or four months, and that G.P. came to live with Litha full time when he turned 16 "until he went into the service." Litha stated that Sonya rented a house from her and her husband in 2003, and that they evicted her in June of 2011. During that time, Litha stated that Sonya only paid one full year of rent. Regarding the condition of the home, Litha stated, "It's never been clean. * * * * ." Regarding her desire for custody of K.E., Litha stated, "I wanted some stability for [K.E.] She is my main concern. I don't want to take her away from her mother. I know she loves her. But she can't live in those conditions and that environment." Litha stated that Sonya never asked permission for Dan to live in the home with her, and that he never paid rent. Litha stated that she changed the locks on the house and photographed the conditions inside. She identified multiple photos taken by her of the home's filthy and cluttered interior.

{¶ 12} Litha stated that she, her husband and K.E. reside in her home. Litha stated that she does not work outside the home, that she can care for K.E., that she has an extended family and friends with whom K.E. regularly has opportunities to interact, and that K.E. often invites friends to her home to play and spend the night. Litha stated that she and her husband own a motor home, and that K.E. enjoys camping with them. She stated that K.E. and B.E. talk on the phone almost every night. Litha testified that K.E. gets up at 6:30 and has breakfast each day before school, and that she regularly does her homework after having a snack when she gets home. She stated that K.E. "had a couple girlfriends come over and they've worked on the [homework] projects at home." She stated that K.E. goes to bed at 9:30 p.m. According to Litha, "[r]eading is about the only thing she has problems with.

And our neighbor lady who is a school teacher that's not working this year said she would * * * work with her one-on-one to see what her problem is." Litha stated that her three-bedroom home is on three acres, and that K.E. has her own room with dressers and a closet. She stated that she has adequate food at home and that K.E. has "tried different foods that she's never had before and found out she liked." Litha stated that K.E. has adequate clothing at her home. Litha stated that K.E. goes bowling every Saturday.

{¶ 13} Litha stated that she facilitates Sonya's parenting time on Tuesdays and Sundays, and that Sonya did not exercise her parenting time on Tuesdays at all in March, 2012, and that she only exercised her Sunday parenting time in that month on the last Sunday thereof. According to Litha, a "couple times she said she was working, and we went by and the car was there. And then we passed her later in the day. We had been to the grocery and headed south, and they were headed north in the truck so I know she wasn't working." Litha stated that if given custody of K.E., she will facilitate both Sonya's and Martin's parenting time.

{¶ 14} Litha stated that neither she nor her husband have any health limitations, and that they are able to provide for K.E. financially. Litha stated that they do not physically discipline K.E., but that they "look at her and say, now you know you are not allowed to be doing that. Usually that's all it takes."

{¶ 15} Litha stated that K.E. has gained ten pounds in the year that she has been in her home. She stated that K.E. has repeatedly asked that certain items that belong to her that are in Sonya's home be returned to her, and that the items have not been returned. Litha stated that her family eats meals together every night between 5:00 and 5:30 p.m. Litha

stated that at one time the police were called to facilitate Sonya's parenting time because K.E. "did not want to go with her mother." When asked on cross-examination, "is the main problem you have with Sonya parenting K.E., Mr. Weaver?" Litha responded, "[m]ost of it. A lot of it, yes."

{¶ 16} Sonya testified that Dan is her fiancé, and that they reside in a two-bedroom home. She stated that the lease is in Dan's name, and that the rent and utilities are current. Sonya identified photographs of the residence depicting a mostly clean and uncluttered interior. Sonya stated that K.E. has her own room with a bed and a place to do homework. She stated that K.E. has few clothes at her home because "she's outgrown most of her clothes since the time they took her," but that she is able to buy clothes for her in the event K.E. is returned to her. She stated that she has adequate food in her home. She stated that she and Dan are employed. She testified that she has observed K.E. and Dan interact, and that she and Dan took K.E. to a steam engine show in Xenia, spending the weekend at the fairgrounds in a camper. She stated that she and Dan also took K.E. on a camping trip to Indiana and Kentucky, and that she did not observe any problems between Dan and K.E. She stated that when K.E. resided with her and Dan, K.E. and Dan interacted everyday, and that she never observed any problems between them. Sonya stated that Dan did not discipline K.E., but that she has "smacked her for talking back," taken things away from her, and denied her permission to go places. She admitted that she withheld K.E. from the Parkers. In the event K.E. is returned to her, Sonya stated that she will only discipline K.E. by taking things away from her because "that seemed to get her attention more."

{¶ 17} Sonya stated that when K.E. resided with her, she "would go to her school

programs, go to her conferences, talk to her teachers, find out what else needed to be done to help her progress." She stated that K.E. participated in cheerleading, bowling and softball. The following exchange occurred:

Q. And what years did she do those activities?

A. She did them since she was, I'm going to say about 6. So two years ago.

Q. * * * And why did they discontinue?

A. One year I signed her up for cheerleading, and then my parents decided to go to Texas, and she wanted to go after I paid the money out for her cheerleading outfit.

* * *

A. And I could not get that undone.

Q. So you enrolled her in the activity is what you are saying?

A. Yes, I did.

Q. * * * Did you enroll her in other activities?

A. Not after that, no.

Sonya stated that if K.E. were returned to her care, she would "try my best" to enroll her in extracurricular activities, and that "it depends on how much things cost."

{¶ 18} Sonya stated that her parents evicted Dan from the home she rented from them. She acknowledged that Litha's photos of the home accurately reflected its condition when they were taken, but she denied that it was always so dirty. When asked why it was so dirty in the photos, she stated, "Because I was trying to go through things. I was working

extra hours, taking the kids to their extracurricular activities. I would get their rooms cleaned, and they would not help keep them clean." She stated that she will keep her home clean in the future.

**{¶ 19}** Sonya acknowledged that Children's Services was involved with her family after "[B.E.] and I got into a fight, which he started hitting me, I hit him back. And then he went next door, called his father, called the cops saying that I was beating him." She stated that B.E. was criminally charged but she was not. She stated that she does not have any criminal convictions related to K.E., nor any drug or alcohol related offenses.

**{¶ 20}** Sonya stated that her normal work hours are 6:00 am to 2:30 p.m., "but I have been known to go in at 4:00 and stay until 5:30 or 6:00 at night." She stated that she would take K.E. to a babysitter for morning care. She stated that the babysitter's name is Jennifer, but "I can't remember her last name right offhand." Sonya stated that she previously took K.E. to another babysitter when K.E. resided with her, and that "I'd drop her off anywhere from 3:30 to 4:30 in the morning" about "every day."

**{¶ 21}** Sonya stated that she has concerns about her ability to exercise her parenting time with K.E. if her parents are awarded custody. She stated, "I've had to work overtime at my work, and I would go in work early, stay like everybody else, make sure I could keep my job. And they told me I was not allowed to get her because I was late." Sonya stated that K.E. should be returned to her home because "I am her mother, and I was teaching her how to do things." Sonya stated that she loves K.E. She stated that she is able to provide for her daughter's needs, protect her from Dan, and that she is willing to participate in counseling "[m]aybe with just [K.E.]" Sonya testified that if K.E. is returned to her care,

she would be willing to allow her to see the Parkers "[a]t some point in time."

{¶ 22} On cross-examination by counsel for the Parkers, Sonya stated that she has told K.E. that if she regains custody of her, K.E will see the Parkers "when I decide to have her see them." When asked if she would allow the Parkers to have the visitation that Sonya has been entitled to while K.E. is in the Parkers' care, Sonya responded, "I'm not - - I don't know."

{¶ 23} The following exchange occurred:

Q. You were told, weren't you, that [K.E.] could visit you in your home if Dan was not there, correct?

A. Yes, but it's Dan's house.

Q. Is it your house?

A. I live there. The lease is not in my name.

Q. So for once a month your visitation has consisted of picking [K.E.] up and walking around stores, correct?

A. That's true.

* * *

Q. Did you ever have a conversation with Dan asking him whether he would consider for your sake and for [K.E.'s] sake and your parenting bonding whether he could just maybe be absent every once in a while so you could be at the home?

Ever have that conversation with Dan?

A. No, I haven't.

Q. You're going to marry him and you can't talk about your daughter's rights and your daughter's bonding with you?

A. It's his house right now.

Q. It's going to be his house if you get your daughter back, isn't it?

A. Yes.

Q. And he's going to call the shots then too, isn't he?

A. No, he's not.

Q. So you're going to start standing up to him if you get your daughter back, but you haven't now because it's his house?

A. I've always stood up to him.

Q. But not for your daughter?

A. I'm not going to ask him to leave his house so we can go over there and what, watch TV?

Q. Wouldn't that be better than walking around stores?

A. No. She likes walking around stores.

{¶ 24} Regarding evening meals in Sonya's home, the following exchange occurred on cross-examination:

Q. Do you dispute what your children have said that you didn't have sit-down meals together in the evenings?

A. They wanted to eat in their rooms.

* * *

A. So they could watch their TV, their programs.

Q. So again, just in this particular area which do you think is better; the family unit that sits down and eats evening meals together every night or you fixing something, her going to her bedroom, and you sitting out in the kitchen and eating with Dan? Which of those is better for her?

A. She didn't always eat in her room.

Q. Which of the two is better for her?

A. Probably sit down.

Q. You're going to stay with Dan, aren't you?

A. Yes, I am.

Q. That's your intention. You['re] getting married?

A. Yes, we are.

{¶ 25} The following exchange occurred on cross-examination by Martin:

Q. When we had the night on a Sunday night and I brought the kids to town and had you come to the police station to pick the kids up, did you slap [K.E.] across the face with Mr. Weaver standing across the street at the post office watching us?

A. I did not have him over there. He went to do his own thing. I went to pick her up. If he went to check on the mail at that time, that was his prerogative to go check his mail at that time.

Q. So why do you think that it's appropriate for punishment to slap [K.E.] across the face when she does something wrong?

A. I have punished her that way because she talked back just like I

was punished when I was growing up by talking back. * * *

Q. * * * How many times have you lost tempers (sic) with people and slapped them in the face? * * * How many times have you hit your mom in the face by losing temper?

A. Maybe once.

Q. And who pulled you off of her?

A. I don't remember.

A. So the incidents that you had with [B.E.] and [K.E.] is their fault?

Q. When they don't listen and they're told to do something, they need to listen to what I say. When I tell them they can't go somewhere or it's time to go to bed, turn the phone off, turn the TV off, and when they get mad and decide to call their grandparents to intervene, yes, that's their problem.

{¶ 26} The trial court's decision reflects that the court conducted an in camera interview of K.E. in the presence of Brandin. In awarding custody to the Parkers, the trial court determined that Sonya "has put her relationship with [Dan] above her relationship" with K.E., "even though that is the most significant source of stress, fear, and concern for the child." The court found that Sonya's "residence is chaotic in both its physical condition and the relationships" between Sonya and Dan, and Sonya and K.E. The court considered the recent improvement in the condition of Sonya's home "to be too little too late with no history to prove that [Sonya] can maintain the residence in its improved condition." The court further noted that Sonya "by her own admission and corroborated by other witnesses

has physically disciplined the child," and the court found that "the physical discipline used was totally inappropriate and excessive." The court noted that Sonya "is not willing to permit the child an ongoing relationship with the [Parkers] even though they have been very involved with the child her entire life including residing with them off and on even prior to these proceedings." The court found that Sonya "fails to put the needs of the child first, including, but not limited to, proper nutrition/meals, appropriate living/sleeping space, proper amount of sleep, involvement in extracurricular activities, appropriate discipline, teaching and guidance as the child matures into an adult, and priority of her relationship with the child over that of her fiancé."

{¶ 27} In contrast, the court found that the Parkers "provide a stable, suitable environment for the child, putting her day-to-day needs and extras involved in raising a child as a priority in their lives. The court noted that Martin believes that Sonya is unsuitable, and that it is in K.E.'s best interest that the Parkers receive legal custody of her. The court further noted the recommendation of the Guardian ad Litem that the Parkers receive legal custody. The court indicated that K.E. "desires to stay with" the Parkers.

{¶ 28} The court found "by a preponderance of the evidence that it would be physically, mentally, and emotionally detrimental for the child to be in the custody of her mother. Thus, the court determines the Defendant/Mother to be unsuitable." The court concluded "after consideration of the factors in R.C. 3109.04 that it is in the best interests of the child to be placed in the legal custody" of the Parkers.

{¶ 29} The court's Entry finally provides as follows:

Beginning with Tax Year 2012 and all years thereafter, [the Parkers]

shall claim [K.E.].

\* \* \*

{¶ 30} Sonya asserts three assignments of error herein. We will consider her first and second assignments of error together. They are as follows:

"THE TRIAL COURT ERRED IN FINDING APPELLANT UNSUITABLE."

And,

"THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE BEST INTEREST OF THE MINOR CHILD TO AWARD LEGAL CUSTODY TO THIRD PARTY DEFENDANT/APPELLEES."

{¶ 31} According to Sonya, the Parkers "have failed to meet the burden to overcome the presumption that [she] should retain custody of her minor child. The record is simply devoid of any proof of drug abuse, alcohol abuse, domestic violence, neglect, medical problems with the minor child, education problems with the minor child, or any matter that would raise the findings deeming Appellant unsuitable." She further asserts that K.E. "has a loving home with her mother/Appellant and it is in the best interest to retain that relationship."

{¶ 32} As summarized by the Eighth District:

R.C. 2151.23(A)(2) vests exclusive original jurisdiction in the juvenile court over custody disputes concerning "any child not a ward of another court of this state[.]" This typically encompasses custody disputes between parents and nonparents. *Scavio v. Ordway*, 3d Dist. No. 17-09-07, 2010-Ohio-984, 2010 WL 893662, ¶ 18. "[R.C. 2151.23], unlike R.C.

3109.04, does not state a test or standard to be used by the juvenile courts in determining child custody cases." *Hockstok v. Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 15. However, Ohio case law offers guidance on the issue.

In custody cases between a parent and nonparent, there is an overriding principle "that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstok* at ¶ 16. Further, a parent who is deemed suitable has a paramount right to the custody of his or her minor child unless they have forfeited that right. *Id.* at ¶ 21. Thus, "a finding of parental unsuitability has been recognized * * * as a necessary first step in child custody proceedings between a natural parent and nonparent." *Id.* at ¶ 18.

In *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), the Ohio Supreme Court held:

In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability - that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.  Id. at syllabus.

We emphasize that "[t]he appropriate analysis is whether the natural [parent] is unsuitable as custodian, not whether someone else is more suitable." *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, 828 N.E.2d 1044, ¶ 31 (8th Dist.), McMonagle, J., concurring. Nonparents seeking custody have the burden of demonstrating a parent's unsuitability. *Scavio*, 3d Dist. No. 17-09-07, 2010-Ohio-984, 2010 WL 893662, at ¶ 26.

* * * [W]here a parent is found unsuitable, the juvenile court must determine whether an award of legal custody to the nonparent is in the best interest of the child. *See Reynolds v. Goll*, 75 Ohio St.3d 121, 124-125, 661 N.E.2d 1008 (1996). This is in accordance with R.C. 2151.23(F)(1), which requires that the juvenile court exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04. R.C. 3109.04(B)(1), provides that in any original grant or subsequent modification of custody, the court shall consider the best interest of the child. *In re D.C.J.*, 2012-Ohio-4154, 976 N.E.2d 931, ¶ 56-59 (8th Dist.).

**{¶ 33}** As this Court has noted:

The Ohio Supreme Court has recognized that the deference to be accorded to a trial court's assessment of conflicting evidence in child custody disputes is especially great, because the credibility issue is "even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 419, 674 N.E.2d 1159. *In re Stansell*,

2d Dist. Miami No. 17693, 1999 WL 959621, * 1 (Aug. 6, 1999).

{¶ 34}  "On appeal, we will not reverse an award of legal custody absent an abuse of discretion. * * * ."  *In re Starks*, 2nd Dist. Montgomery No. 1646, 2005-Ohio-1912, ¶ 17.  As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable.  (Internal citation omitted).  It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision.  It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.  *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 35}  Having thoroughly reviewed the record, we conclude that Sonya's unsuitability is established herein, that it is in K.E.'s best interest that the Parkers be awarded custody of her, and that an abuse of discretion is not demonstrated.  The trial court clearly found the testimony of Brandin, B.E., Martin and Litha to be more credible than Sonya's, and we defer to the trial court's assessment of credibility.  Brandin's, B.E.'s, and Litha's testimony is consistent regarding the unclean condition of Sonya's home, and we

agree with the trial court that Sonya's lengthy history of uncleanliness and clutter does not support a conclusion that Sonya will maintain the current orderly condition of her home. B.E. testified that Sonya does not provide regular meals in her home, Martin testified that K.E. was undernourished while in Sonya's care, and Litha testified that K.E. has gained 10 pounds since being removed from Sonya's care. Brandin testified that Sonya prioritizes her relationship with Dan over her relationship with K.E., and Sonya's own testimony reflects that Dan's convenience in the use of the home he shares with her is more important to her than K.E.'s ability to share parenting time there with her mother. Litha stated that Sonya repeatedly failed to exercise her parenting time in March, 2012. Brandin and Martin testified that Sonya physically disciplines K.E. in an inappropriate manner, and Sonya admitted that she "smacked" K.E. for talking back to her. Sonya stated that the discipline that K.E. receives is K.E.'s fault. Sonya's work schedule, pursuant to which, in the very early morning hours, she leaves K.E. with a babysitter whose last name she cannot remember, is disruptive of K.E.'s ability to sleep. B.E. stated that Dan is physically and emotionally abusive to K.E., and that Sonya does nothing to prevent Dan, the person that the trial court determined was "the most significant source of stress, fear, and concern for the child," from harming K.E. Litha stated that Dan's influence is her primary concern with Sonya's parenting of K.E. Finally, it is clear from the record that Sonya does not recognize the benefit of the Parkers' on-going presence in her daughter's life. This conclusion is supported by Sonya's self-serving characterization of the Parkers, in her brief herein, as "simply overly controlling grandparents who disapprove of any male figure" in her life. While K.E. was in her care, Sonya withheld her from the Parkers, and we find that the record

does not support a conclusion that Sonya would consistently facilitate interaction between the Parkers and K.E. For the foregoing reasons, we agree with the trial court that "it would be physically, mentally, and emotionally detrimental" for K.E. to be in Sonya's custody. In other words, Sonya is unsuitable.

{¶ 36} Regarding Sonya's assertion that the factors set forth in R.C. 3109.04(F)(1) support a finding that it is in K.E.'s best interest for Sonya to have custody of K.E., we disagree. The evidence in the record overwhelmingly supports a conclusion that an award of custody to the Parkers is in K.E.'s best interest. The court indicated that such an award is in accord with K.E.'s wishes; K.E. is well-adjusted to her home, school and community, and her welfare is a priority in the Parkers' home; the Parkers are in good health and able to meet K.E.'s needs; and the Parkers are more likely to facilitate K.E.'s parenting time with Sonya and Martin. *See* R.C. 3109.04(F)(1).

{¶ 37} Since Sonya is not suitable, and an award of legal custody to the Parkers is in K.E.'s best interest, an abuse of discretion is not demonstrated, and Sonya's first and second assigned errors are overruled.

{¶ 38} Sonya's third assigned error is as follows:

"THE TRIAL COURT ERRED IN AWARDING THE TAX DEPENDENCY EXEMPTION TO THE THIRD PARTY DEFENDANTS/APPELLEES."

{¶ 39} According to Sonya, "it is in the best interest of the minor child for Appellant to receive a financial benefit of claiming the minor child as a tax dependent. Allocating the exemptions in any other fashion would be foregoing funds that Appellant could use for the benefit of her minor child." The Parkers respond that if Sonya "received a greater refund, she

would not pay more support, there is no indication she would be spending the money on her daughter, and because her daughter is not living with her, her daughter would not receive the benefit of an increased standard of living at her house." The Parkers further assert that K.E. "spends virtually every night in the custodial grandparents' home. Nearly all meals are provided by the custodial grandparents. The court order places the obligation upon the custodial grandparents to pay any uninsured portion of medical expenses. The extracurricular expenses and the school-related expenses are borne by the grandparents * * *."

{¶ 40} Pursuant to 26 U.S.C. Secs. 151(c) and 152(a), a taxpayer may claim a dependency exemption deduction with respect to an individual who is either a "qualifying child" or a "qualifying relative." A "qualifying child" is an individual in relevant part:

(A) who bears a relationship to the taxpayer described in paragraph (2)[1],

(B) who has the same principal place of abode as the taxpayer for more than one-half of such taxable year,

(C) who meets the age requirements of paragraph (3)[2],

(D) who has not provided over one-half of such individual's own support for the calendar year in which the taxable year of the taxpayer begins, * * *

* * * . 26 U.S.C. Sec. 152(c)(1).

{¶ 41} A "qualifying relative" is defined in relevant part as an individual who "is not a

---

[1]Pursuant to paragraph (2)(A), "an individual bears a relationship to the taxpayer * * * if such individual is * * * a child of the taxpayer or a descendant of such a child."

[2]Pursuant to paragraph (3)(A)(i), "an individual meets the requirements of this paragraph if such individual is younger than the taxpayer claiming such individual as a qualifying child and * * * has not attained the age of 19 at the close of the calendar year in which the taxable year of the taxpayer begins * * *."

qualifying child of such taxpayer or of any other taxpayer for any taxable year beginning in the calendar year in which such taxable year begins." 26 U.S.C. Sec. 152(d)(1)(D).

{¶ 42} Pursuant to 26 U.S.C. Secs. 151(c) and 152(a), K.E. is a qualifying child for purposes of the Parkers' entitlement to a dependency exemption, and Sonya is not entitled to claim K.E. as a qualifying child or a qualifying relative. Since the trial court properly awarded the tax dependency exemption to the Parkers, Sonya's third assigned error is overruled.

{¶ 43} Having overruled Sonya's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, P.J. and HALL, J., concur.

Copies mailed to:

Martin D. Evans
Steven R. Fansler
Jay M. Lopez
Hon. Lori L. Reisinger