[Cite as *In re D.D.*, 2017-Ohio-8392.]

STATE OF OHIO, CARROLL COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN RE:, | ) | CASE NO. 17 CA 0914 |
| | ) | |
| D.D., DOB: 06/17/2007, | ) | |
| | ) | |
| T.A.J., | ) | |
| | ) | |
| PETITIONER-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| G.L.D., | ) | |
| | ) | |
| RESPONDENT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:  Civil Appeal from the Court of Common
Pleas, Juvenile Division of Carroll
County, Ohio
Case No. 20164005

JUDGMENT:  Affirmed.

APPEARANCES:

For Petitioner-Appellee:  Atty. Kathleen Allmon Stoneman
63 2nd Street SW, P.O. Box 326
Carrollton, Ohio 44615

For Respondent-Appellant:  Atty. Michael J. Roth
200 North Main Street
Minerva, Ohio 44657

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated:  October 20, 2017

ROBB, P.J.

{¶1} Appellant G.D. appeals the decision of Carroll County Common Pleas Court, Juvenile Division, finding him unsuitable and granting custody of his minor child to Appellee T.J., the child's maternal uncle. The issue in this case is whether the trial court abused its discretion in finding Appellant unsuitable. We hold the trial court did not abuse its discretion.

<u>Statement of the Facts and Case</u>

{¶2} Appellant and mother were married in March 2002. They resided in Carroll County, Ohio and had one child born in June 2007. Appellant filed for divorce in 2012. The divorce was finalized February 26, 2014. Mother was granted sole custody of the minor child and Appellant was granted supervised visits every Sunday for two hours. Why this limited visitation was ordered is not apparent from the record. The divorce decree, which is a part of the record, does not indicate the factual basis for supervised visits.

{¶3} The supervised visits occurred at one of two places, McDonald's or the park, and were supervised by mother or Appellee. Appellant consistently exercised his right to visitation.

{¶4} Following the divorce, the child and Appellant participated in some joint counseling sessions. These counseling sessions were to create a bond between Appellant and the child. The child also had private sessions with another therapist.

{¶5} Mother was diagnosed with cancer either shortly before the divorce was finalized or sometime after it was finalized. Following the divorce, Mother and child lived with Appellee and Appellee helped Mother with treatments and caring for the child. Mother died January 2, 2016.

{¶6} Following her death, Appellant and Appellee both filed petitions for custody in the Juvenile Court. 1/11/16 Appellee petition for custody; 1/11/16 Appellant petition for custody. The case proceeded to a bench trial. 10/13/16 and 11/17/16 Trial.

{¶7} During pendency of the action, Appellant continued exercising his visitation and Appellee permitted the visitation to be unsupervised. The child

continued to have private sessions with a therapist and another attempt at joint counseling with Appellant and the child occurred.

**{¶8}** After two days of testimony, the trial court took the matter under advisement. The trial court found, based on the child's feeling of ill will for Appellant, Appellant was unsuitable. The trial court then determined it was in the best interest of the child for custody to be awarded to Appellee. 1/30/17 J.E. Appellant was granted visitation. The visitation was expanded; Appellant was granted visitation every other weekend, holidays were alternated, and Appellant was granted two weeks of summer visitation. 2/7/17 J.E.

**{¶9}** Appellant timely appeals the award of custody of the child to Appellee, a non-parent.

### Assignment of Error

"The trial court violated Appellant's Fourteenth Amendment Right to care and custody of his child when it failed to correctly apply the *Perales* unsuitability test in divesting father of custody and granting custody to a non-relative."

**{¶10}** The juvenile court has exclusive original jurisdiction to determine the custody of a child who is not a ward of another Ohio court. R.C. 2151.23(A)(2). *See also* R.C. 2151.23(F)(1) (the juvenile court shall exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04). Although a domestic relations court has continuing jurisdiction over child custody and child support resulting from a divorce, a child who is the beneficiary of those orders is not a ward of that court; the two courts have concurrent jurisdiction. *Freed v. Freed*, 3d Dist. No. 5-15-15, 2015-Ohio-4527, ¶ 6. Therefore, although custody and support were previously determined by the domestic relations court, the juvenile court had jurisdiction to determine the child's custody in the matter at hand.

**{¶11}** A trial court has broad discretion in determining custody matters. *Reynolds v. Goll*, 75 Ohio St.3d 121, 124, 661 N.E.2d 1008 (1996). Thus, the court's unsuitability and custody determination is reviewed for an abuse of discretion. *Polhamus v. Robinson*, 3d Dist. No. 8-16-11, 2017-Ohio-39, ¶ 15-17. When applying an abuse of discretion standard, we are not free to merely substitute our judgment for

that of the trial court. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). A deferential review in a child custody case is appropriate because much may be evident in the parties' demeanor and attitude that does not translate well to the record. *Id.* at 419.

{¶12} The custody of a child is a "fundamental liberty interest" of a parent. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The right of a parent to rear his/her own child presents itself in custody proceedings between a parent and a non-parent, as opposed to a custody proceeding between two parents. *In re Perales,* 52 Ohio St.2d 89, 96, 369 N.E.2d 1047 (1977).

{¶13} The suitability test has a higher standard than the best interest test. We have previously explained:

> Under the best interest test, the court looks for the best situation available to the child and places the child in that situation. The suitability test, on the other hand, requires a detriment to the child be shown before the court takes him/her away from an otherwise suitable parent. Under the suitability test, "[s]imply because one situation or environment is the 'better' situation does not mean the other is detrimental or harmful to the child."

(Internal citations omitted). *In re DeLucia v. West*, 7th Dist. No. 05-MA-5, 2005-Ohio-6933, ¶ 16.

{¶14} Under the suitability test, a parent is unsuitable if the parent abandoned the child, the parent contractually relinquished custody of the child, the parent has become totally incapable of supporting or caring for the child, or an award of custody to the parent would be detrimental to the child. *Perales* at syllabus. The non-parent must prove unsuitability by a preponderance of the evidence. *Id.*

{¶15} In finding Appellant unsuitable, the trial court stated:

> The Court further finds that no evidence was offered that the father is unfit, abusive or unsuitable to be an appropriate parent.

The Court further finds that the minor child has a dislike for his father, going as far as to wish him dead. The level of mistrust and outright animosity toward father is extreme. Even when father acts appropriately the son only perceives evil intentions. When son speaks badly of dad it is with little emotion.

The Court further finds that visits are continuing with mixed results. The counselors cannot give a definitive opinion about how to resolve this dilemma. Additional time with father could cause issues for the son, not dealing with the issues could have long term effects.

The Court further finds that a parent has a right to raise his/her child, unless the Court finds them to be unfit, unsuitable or that custody would put the child at risk of harm.

* * *

The Court must find that unsuitability exists before the best interest factors 3109.04 ever come into play. In this case there is no evidence that father is unfit in the usual sense. He wants to parent his son. He has never been convicted of domestic violence, child abuse or neglect. He lives with his girlfriend and her children. Based on reports of her children, they are all fond of him. He has, in the face of very limited visitation, continued to exercise that visitation. He has attended counseling with multiple counselors. He has endured his son's pointed and unremorseful acts. He makes his home and his new family available for visits.

* * *

The issue the Court must decide is does the child's feeling of ill will and hatred for the father constitute the father being an unsuitable parent.

The facts of this case are fairly straight forward. The minor child has developed a feeling of hatred for his father. The minor child had limited supervised visitation with his father for approximately four years.

He had never visited his father's home or father's new family. The minor child's mother died of cancer and the child believes it is his father's fault. The minor child openly expresses his desire that his father die.

Whatever happened between father and mother, no criminal charges were ever filed, much less a conviction.

The child's extended family, while being well intended, have done little to change the child's beliefs.

Dad has a girlfriend with whom he lives. She has children and her children like dad and do not fear him.

The child's counselor has expressed possible serious ramification from the child being forced to live with dad. The same counselor expressed little hope for a change in the child's feelings and he offered no real option to achieve change.

The child is in effect losing one parent to death and one to misguided hatred.

The Court finds that the child's mental health, resulting in the total lack of a family bond with his father, renders his father incapable of adequately parenting his son.

1/30/17 J.E.

{¶16} These statements are a finding that Appellant is unsuitable per se, at this moment in time, with this specific child; he is unsuitable because it would be detrimental to the child for Appellant to be granted custody. This finding was based on the emotional and psychological effects, which sometimes become physical effects, a grant of custody to Appellant would have on the child.

{¶17} The phrase "detrimental to the child" is not defined by the Revised Code. However, Ohio courts have held that for an award of custody to a parent to be detrimental to the child, there must be serious problems with the unsuitable parent. *In re C.V.M.*, 8th Dist. No. 98340, 2012–Ohio–5514, ¶ 12; *In the Matter of R.J.E.*, 11th Dist. No. 2016-P-0025, 2017-Ohio-886, ¶ 28. "'[D]etriment' to a child includes not

only the physical and mental effects a custody award may have on a child, but also the emotional and psychological effects as well." *In re M.B.*, 9th Dist. No. 26004, 2012-Ohio-687, ¶ 12, quoting *Ives v. Ives*, 9th Dist. No. 02CA008176, 2003-Ohio-3505, ¶ 19. However, obvious transitional issues of moving from one home to another (i.e., change of home, school, community, friends) are not the type of detriment contemplated by *Perales* that would make a parent unsuitable in the context of a custody dispute between a natural parent and a nonparent. *In re C.V.M.*, 2012-Ohio-5514 at ¶ 13, citing *In re Davis*, 11th Dist. No. 02–CA–95, 2003–Ohio–809, ¶ 27–28.

{¶18} The issue before this court is whether the trial court abused its discretion in finding unsuitability because it would be detrimental to the child for custody to be granted to Appellant.

{¶19} The evidence established Appellant lives with his girlfriend, Crystal, and her two daughters, ages 12 and 15, in Summit County. 11/17/16 Tr. 183, 185. Crystal was a foster parent and her daughters were two of her foster children that she adopted. 11/17/16 Tr. 186-187. She has two adult sons and one grandson, who Appellant babysits. 11/17/16 Tr. 186, 190. Appellant gets along with all of her children. 11/17/16 Tr. 190-191. She owns the house and is a nurse for Akron Children's Hospital working at the Summit County Juvenile Detention Center Clinic. 11/17/16 Tr. 183, 193. Appellant does odd jobs and helps around the house. 11/17/16 Tr. 193, 204-205. The house has four bedrooms and one room is already decorated in Star Wars motif for the child. 11/17/16 Tr. 184-185. The house sits on three and half acres and they own a horse, two dogs, and multiple cats. 11/17/16 Tr. 184-185.

{¶20} As the trial court noted in the judgment entry, there were no domestic violence complaints filed against Appellant, allegations of child abuse against Appellant, or finding of wrong doing on the part of Appellant. The testimony established Appellant's relationship with his girlfriend's children is very good and is appropriate.

**{¶21}** That said, the child has memories of incidents between mother and Appellant. Prior to divorce and separation, the child witnessed verbal altercations between mother and Appellant. During one of the altercations, Appellant allegedly threw his phone and it hit the child on the forehead. The child also has a memory of Appellant and mother fighting at the top of a staircase and Appellant holding a broom handle against mother's neck. The child expressed concern that mother could have fallen down the steps and died. The child also had memories of him and mother being locked out of the house and of them locking themselves in a bedroom to protect themselves from Appellant.

**{¶22}** When the incidents were discussed in a joint counseling session with Mario Costello (child's individual counselor), Appellant denied the incidents happened in the manner the child described. 10/13/16 Tr. 46. Appellant indicated the child was not recalling the incident correctly and seemed to indicate mother was more of the aggressor. 10/13/16 Tr. 46. Appellant's version made the child very upset and agitated; the child called Appellant a liar. 10/13/16 Tr. 46-47. Appellant, however, apologized to the child for having witnessed those events, but did not apologize for the acts. 10/13/16 Tr. 48. The child was not accepting of the apology. 10/13/16 Tr. 49. Costello indicated the apology was very good. 10/13/16 Tr. 48. He indicated Appellant asked if it would be helpful if he lied to the child and said he did those things. 10/13/16 Tr. 49. Costello told Appellant not to lie. 10/13/16 Tr. 49.

**{¶23}** Costello testified there is no bond between Appellant and the child, and the child told the counselor he is afraid of his father; the child has "zero to very little trust" in Appellant. 10/13/16 Tr. 42, 49-50. The counselor opined, "[T]he child's resentment and avoidance associated with his father appears to be, in part, his way of protecting himself emotionally and physically and protesting the fact that he does not want to live with his father." 10/13/16 Tr. 45. In addition to his fear of Appellant and not wanting to live with Appellant, Costello indicated the child has not yet started to grieve the loss of his mother:

> Thus, as [the child's] therapist my concern is, in part, that [the child] has not yet begun to grieve the loss of his mother due to the

pending status of being placed with his father. [The child] has rarely spoken about his mother in prior sessions and appears to minimize her absence. [The child] reports trying not to think about his mother because he is too worried he may have to live with his father. Notably, [the child] has also reported that he fears if he has a better relationship with his father, then that will increase the likelihood that he will have to live with him. In other words, [the child's] relationship with his father may improve if he knows that he will not have to live with him.

\* \* \*

If [the child] is placed with his father, someone who he does not feel safe with, [the child's] trauma-like symptoms could be exacerbated, further complicating his bereavement process. Furthermore, placing [the child] with his father at this point could have a negative impact on [the child's] psychological development, leaving him more vulnerable to more severe pathology in the future. Developmentally, [the child] is at a stage when security, trust, and developing a strong sense of self are crucial to him forming strong and healthy attachments in the future.

10/13/16 Tr. 50-51.

{¶24} During Costello's testimony it was brought to light that the child has been diagnosed with adjustment disorder with anxiety. The child also experienced bedwetting and soiling incidents a night or two before the scheduled visitation with Appellant. These incidents were attributed to the anxiety the child faces with the visitation. It is noted the child is 9 or 10; these type of incidents are not common to children of that age. Thus, it seems there is a physical manifestation of the anxiety the child feels when facing the process of bonding with Appellant.

{¶25} In reaching his recommendation, Costello noted Appellant has done everything asked by the counselor. 10/13/16 Tr. 42, 93. When asked if the child put forth the effort to repair his relationship with his father, Costello responded in the negative and opined the child could have put forth more effort. 10/13/16/ Tr. 82.

**{¶26}** That sentiment was echoed by one of the child's earlier counselors, Patricia Millsaps-Linger. Millsaps-Linger counseled the child and Appellant jointly after the divorce for about six months. The mother was still alive during these counseling sessions. Millsaps-Linger opined the child was encouraged to maintain negative memories, thoughts, and feelings and he was being given excuses for bad behavior; he was not encouraged to move beyond his negative thoughts about Appellant. 11/17/16 Tr. 122, 175. She also indicated the child had a fear of disappointing mother and Appellee by engaging in a positive manner with Appellant. Tr. 126. This created anxiety in the child. At counseling he was told to be open and to make a relationship, but at home he was told it was not a good thing. 11/17/16 Tr. 175. She stated mother and Appellee often made excuses for the rude behavior the child exhibited toward Appellant stating he deserved it or indicating the child should not have to visit with Appellant. 11/17/16 Tr. 120. Millsaps-Linger also testified the child frequently used language mother used in her correspondence to Millsaps-Linger or in court proceedings. 11/17/16 Tr. 121.

**{¶27}** However, she also testified the domestic relationship between mother and Appellant had caused the child trauma and he had developed a fear of his father. 11/17/16 Tr. 156. She indicated there was not a strong bond between the child and Appellant; the child "was very resistant to a bond." 11/17/16 Tr. 168. She indicated progress would be slow. 11/17/16 Tr. 174, 176.

**{¶28}** Testimony from both counselors indicated the child was disrespectful to Appellant. He said in front of both counselors he wished his father was dead and other hurtful statements. However, testimony established the child was respectful to everyone else. He is a bright child, has excelled at school, and has friends.

**{¶29}** Appellant argues when the trial court looked at all of the above and found him unsuitable, the trial court incorrectly focused on future harm that may occur if Appellant was awarded custody, the child's anger toward Appellant, and ultimately delegated the decision to the child.

**{¶30}** As to future harm and the child's anger towards Appellant, these were appropriate factors for the trial court to consider because of the effect they were

having on the child. As stated above, detriment to the child includes physical, mental, emotional, and psychological effects a custody award may have on the child. *In re M.B.*, 2012-Ohio-687 at ¶ 12, quoting *Ives*, 2003-Ohio-3505 at ¶ 19. Testimony indicated the child had physical reactions to the anxiety of living with the father which manifested in bedwetting and soiling himself. Counselor Costello indicated the child had not even begun to grieve the loss of his mother and he did not trust Appellant. At the child's age, the counsel opined placing the child with Appellant "could have a negative impact" on the child's psychological development because of the lack of a bond with Appellant. 10/13/16 Tr. 50-51. Testimony from the counselors overwhelmingly indicates there is not a strong bond with Appellant and this causes anxiety for the child. Both indicated the child was having a hard time moving beyond his perceptions (whether those perceptions were right or wrong) of past events.

{¶31} Any move from where a child was living to living with a different person in a different area is going to cause transitional issues. However, obvious transitional issues are not the type of detriment contemplated by *Perales*. *In re C.V.M.*, 2012-Ohio-5514 at ¶ 13, citing *In re Davis*, 2003–Ohio–809 at ¶ 27–28. Here, if Appellant was granted custody then the child would be living with a parent with whom he has spent limited time and has little to no bond despite years of counseling.

{¶32} That said, from reading each of the counselors' statements, it does also appear the child is directing the process. Both counselors indicated Appellant was doing everything asked of him, but the child could have done more to establish a relationship. Also, Counselor Costello specifically stated the child told him that if he has a better relationship with his father, then he will have to live with the father. He fears living with his father. 10/13/16 Tr. 50-51. The child does not want to live with the father. Therefore, he has no incentive to attempt to create a bond with Appellant. Rather, it seems the child has an incentive not to create a bond. Counselor Millsaps-Linger also testified that in her opinion the child was conflicted; if his group counseling with Appellant went well and he enjoyed himself with Appellant, then mother and Appellee were disappointed. She indicated mother and Appellee reinforced negative perceptions about Appellant by condoning the child's bad

behavior toward Appellant (by saying Appellant deserved it and the child should not have to visit with Appellant).

**{¶33}** Case law, on this topic, is very fact specific. We have found a parent unsuitable where the parent was unable or unwilling to care for the child for long periods of time because the parent was homeless and had been unemployed. *In re A.S.*, 7th Dist. No. 11 JE 29, 2012-Ohio-5468, ¶ 12. The parent allowed the child to live in a home without electricity or heat and the living conditions were "filth." *Id.* The parent also permitted the child to witness confrontations with her abusive boyfriends. *Id.*

**{¶34}** We have also upheld an unsuitability finding and affirmed an award of custody to the adult brother of the children where the evidence showed the father was not a part of the children's lives and was verbally and physically abusive. *In re Medure*, 7th Dist. No. 01 CO 3, 2002-Ohio-5035, ¶ 36-39 (Father used severe forms of discipline against the children, including beating them and hitting them with ropes. The adult child seeking custody of the children testified when he was younger, he was "scared to death" of father and his father "would beat me until, you know, I was black and blue and couldn't walk."). Testimony also established father did not keep adequate supplies of food in the house. *Id.* The minor children testified they were afraid of Appellant and did not want him to have custody. *Id.* A counselor opined father had anger management problems. *Id.*

**{¶35}** The Second Appellate District has upheld a trial court's conclusion that "it would be physically, mentally, and emotionally detrimental" for the child to be in the parent's custody where the house was unclean, the child was undernourished, meals were not provided regularly for the child, there was a failure to exercise parenting time, and there were allegations of physical and emotional abuse. *Evans v. Evans*, 2d. Dist. No. 2012 CA 41, 2013-Ohio-4238, ¶ 35.

**{¶36}** The Ninth Appellate District has reversed a trial court's finding that the mother was not unsuitable where numerous witnesses testified the child had been exposed to a chaotic environment filled with fighting and arguing. *In re M.B.*, 2012-Ohio-687 at ¶ 25-29. As a result of that exposure, the child displayed regressive

emotional behavior as a result of the traumatic events she experienced; the child suffered from physical and mental difficulties (headaches and stomachaches) as well as emotional and psychological difficulties (emotional regression and thumb sucking) as a result of living with Mother. *Id.* Based on the record, the appellate court reversed the trial court's decision and awarded custody to the nonparents. *Id.*

**{¶37}** These cases illustrate when a court finds a parent unsuitable there were serious problems with the unsuitable parent. *See also In re Adams*, 9th Dist. No. 01 CA0026, 2001–Ohio–1652 (parent was incarcerated for three months after child was born; parent was currently on probation in two counties; parent had disorderly conduct charges pending against him; parent had not paid child support for some time; parent had failed to use a car seat when transporting child; parent was unable to secure a stable home or lasting employment); *Slivka v. Sealock*, 5th Dist. No. 00–CA–13, 2001 Ohio App. LEXIS 2408, 2001 WL 575181 (May 18, 2001) (parent had history of psychological and behavioral problems; parent's husband had domestic violence conviction).

**{¶38}** In other cases, appellate courts have reversed a trial court's unsuitability finding. The Second Appellate District, for instance, stated the record failed to demonstrate that if the mother retained custody then it would be detrimental to the child. *Cantrell v. Trinkle*, 197 Ohio App.3d 82, 2011-Ohio-5288, 966 N.E.2d 288, ¶ 42-43 (2nd Dist.). In that case, the mother was young, worked, and lived in subsidized housing. *Id.* The appellate court stated those factors did not establish a detrimental effect on the child. *Id.* The record indicated the mother had two aunts who helped watch the child while she was working and the grandparents, who were seeking custody, also demanded to watch the child when the mother was working. *Id.* at ¶ 43, 45. The appellate court also noted there was no evidence in the record showing an inability to care for the child. *Id.* at ¶ 42. In fact, when the health insurance for the child lapsed for one month, as soon as mother discovered the problem, she rectified it. *Id.* at ¶ 44. There was evidence in the record mother drank alcohol and used marijuana recreationally. *Id.* at ¶ 47. However, these were done outside the presence of the child. *Id.* Thus, the appellate court concluded that while

it did not condone the use of marijuana, there was nothing in the record to suggest her use of the substance had been detrimental to the child. *Id.*

{¶39} Specifically as to the lack of bond between the child and the parent constituting or contributing to an unsuitability finding, case law is sparse. The Third Appellate District has upheld an unsuitability finding where the parent did not create a bond with the child. *Liles v. Doyle*, 3d Dist. No. 1-14-48, 2014-Ohio-1681, ¶ 47-53. The court indicated there was a long and significant relationship with the nonparents, with whom she was living. *Id.* at ¶ 47. The parent lacked the basic understanding of what it meant to be a father, which required presence in his children's lives, not just siring them. *Id.* at ¶ 49. The parent lacked involvement with the child and his other twelve children, and lacked consistent visitation with the child. *Id.* at ¶ 47-49. The parent was not present during the first three years of the child's life and only became a parent-figure after the mother's death. *Id.* at ¶ 49. However, even then the parent would often drop the child off with other individuals rather than take the opportunity to build a relationship with the child. *Id.* at ¶ 50. The court specifically indicated the father "failed to demonstrate that he could offer K.J.D. a stable environment, which was important to K.J.D., especially considering the recent and tragic death of her mother." *Id.* at ¶ 50 (father also failed to provide appropriate monetary support for his children).

{¶40} However, in another case, the Appellate Court upheld a trial court's determination the parent was suitable. *Scavio v. Ordway*, 3d Dist. No. 17-09-07, 2010-Ohio-984, ¶ 27. There was testimony mom had not physically visited with the children for several years, was not familiar with the children's schooling, activities, or medical issues, and that she had disappointed the children by missing visitations on occasion. *Id.* The court concluded those facts did not indicate the trial court abused its discretion in finding mother a suitable parent. *Id.* In doing so, the court emphasized "the trial court, as the finder of fact, possesses sound discretion of the allocation of parental rights and responsibilities," and that wide latitude is granted to the trial court in its consideration of the evidence. *Id.*, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988) and *Davis*, 77 Ohio St.3d at 418.

{¶41} These cases highlight the importance of a bond between the parent and the child and indicate when an unsuitability finding is not an abuse of discretion.

{¶42} The case before us is an extraordinarily hard case. There is no evidence the parent has a substance abuse issue, cannot provide for the child, does not demonstrate an interest in the child, or is abusive toward the child. Appellant has never been convicted of domestic violence, child abuse, or neglect. He has done everything the counselors have asked him to do. He exercised his visitation. Appellant has a great relationship with his girlfriend's children. Although it is apparent something happened between Appellant and mother, no criminal charges were ever filed and there was no criminal conviction. Appellant can provide a home for the child.

{¶43} However, as the trial court found, when the child's lack of a bond with Appellant and the child's mental health are taken into consideration, Appellant is unsuitable to parent this child, at this particular time. Child's counselor, Mario Costello, expressed serious ramifications for the child if he is forced to live with Appellant. Costello indicated there is little hope for a change in the child's feelings under those forced conditions. Appellant and the child's prior joint counselor also indicated it is going to be a long and slow process to change the child's feelings toward Appellant. No professional counselor suggested placement of the child with the Appellant. Therefore, the trial court did not abuse its discretion in determining it would be detrimental to the child for custody to be granted for Appellant.

{¶44} We do not enter this decision lightly. The record before us indicates the child's animosity toward Appellant was fostered by mother and may be unfounded. As the trial court aptly stated, "The child is in effect losing one parent to death and one to misguided hatred." 1/30/17 J.E. We recognize, as the trial court did, Appellant has done everything asked of him and has continued to fight for his relationship with the child. The emotional and psychological impact of granting custody to Appellant, at this point in time, cannot be overlooked. However, our ruling does not mean Appellant is foreclosed from ever obtaining custody of the child. If the

counseling and extended visitation result in a stable healthy bond between the child and Appellant, such bond could qualify as a change of circumstance.[1]

### Conclusion

**{¶45}** The sole assignment of error lacks merit. The trial court did not abuse its discretion in awarding custody to Appellee. The trial court's decision is affirmed.


Waite, J., concurs.

DeGenaro, J., concurs in judgment only.

---

[1] In the future, Appellant will have to employ change of circumstance test to seek custody of the child. *Polhamus*, 2017-Ohio-39, at ¶ 26, citing *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, 866 N.E.2d 467; *Purvis v. Hazelbaker*, 181 Ohio App.3d 167, 908 N.E.2d 489, 2009–Ohio–765, ¶ 10 (4th Dist.) ("[O]nce custody has been awarded to a nonparent, the court will not apply the *Perales* unfitness standard to a later request for custody modification. Instead, custody modification in that situation is determined under the R.C. 3109.04 change in circumstances/best-interest standard."); *In re V.M.B.*, 11th Dist. No. 2012-P-0112, 2013-Ohio-4298, ¶ 53 (same).