[Cite as *In re M.B.*, 2012-Ohio-687.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.B.

C.A. No.     26004

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     LC 09-11-10246

DECISION AND JOURNAL ENTRY

Dated: February 22, 2012

WHITMORE, Presiding Judge.

{¶1}    Appellants, Dianne ("Grandmother") and Fredric B. ("Grandfather") (collectively "Grandparents"), appeal from the judgment of the Summit County Court of Common Pleas, Juvenile Division, dismissing their complaint for legal custody of their granddaughter and finding in favor of their daughter, Appellee, Tressa S. ("Mother").  This Court reverses.

I

{¶2}    Grandparents and Mother have a highly contentious relationship that has only proven more caustic over time.  Mother gave birth to her daughter, M.B., on January 8, 2002, and primarily relied upon Grandparents for support.[1]  Grandparents were heavily involved in M.B.'s life from birth and provided for her needs, both by offering financial support and caring for her when Mother needed their assistance.  The living arrangement proved successful for

---

[1] M.B.'s father was never a part of her life and has no role in this case.

several years, as Mother and M.B. lived with Grandparents from 2003 until 2007. In December 2007, however, Mother met Michael S., and the relationship deteriorated.

{¶3} During her relationship with Michael, Mother moved numerous times. Although she and Michael wanted to live together, their financial difficulties often interfered with their plans and forced them to live a fairly nomadic lifestyle. In the span of two years, Mother and Michael lived in roughly twelve places, usually returning to his mother's house if they had nowhere else to go. Grandparents kept a room for M.B. at their home and often watched her while Mother stayed with Michael. In August 2009, four months after their wedding, Mother and Michael moved to South Carolina and took M.B. with them. The two also took their son, who was born before they left. They later had another child together while living in South Carolina.

{¶4} M.B. remained in South Carolina until November 2009. On November 8, 2009, Mother called Grandparents and asked them to drive to South Carolina to bring her, M.B., and the baby home. Grandparents drove to South Carolina, but Mother ultimately decided to remain there with the baby. She asked them to take M.B. back to Ohio for a short time, and they complied. A disagreement soon arose, however, as to when Grandparents were to return M.B. to South Carolina. Believing that Mother and Michael had an abusive relationship and that Mother could not provide M.B. with a stable and safe home, Grandparents decided to keep M.B. in Ohio and seek legal custody.

{¶5} In November 2009, Grandparents filed a complaint for legal custody as well as emergency temporary custody in Summit County. The trial court eventually determined that it lacked jurisdiction to hear the action under R.C. Chapter 3127 and dismissed the complaint, thereby reinstating Mother's custody. The court's ruling sparked an incident on April 13, 2010,

during which Mother, Michael's mother, and another individual, forcibly removed M.B. from Grandparents' car after following the car into a parking lot. The incident resulted in the arrival of both the police and Summit County Children Services ("CSB"). CSB temporarily placed M.B. in the custody of other family members while Grandparents sought a stay of the trial court's judgment, which they later received. Grandparents appealed after receiving a stay, and this Court reversed the trial court's dismissal. *In re M.B.*, 9th Dist. No. 25343, 2010-Ohio-3979. We remanded the matter to the trial court for it to determine whether Ohio had jurisdiction to hear the matter "pursuant to alternate provisions of R.C. 3127.15(A)." *Id.* at ¶ 20.

{¶6} Upon remand, the trial court determined that it had jurisdiction and appointed a guardian ad litem for M.B. The court held a trial on June 14, 2011. On June 24, 2011, the court issued its decision. The court determined that Grandparents failed to prove Mother's unsuitability and denied their motion for custody. As such, the court terminated temporary custody and ordered that M.B. be returned to Mother.

{¶7} Grandparents appealed from the trial court's judgment and sought an emergency stay. This Court granted their motion, staying the execution of the judgment until the issuance of this Court's decision in this matter. On appeal, Grandparents raise two assignments of error for our review. For ease of analysis, we rearrange their assignments of error.

II

Assignment of Error Number Two

THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' COMPLAINT FOR CUSTODY ON THE GROUNDS THAT APPELLANTS FAILED TO PROVE THAT APPELLEE WAS AN UNSUITABLE PARENT.

{¶8} In their second assignment of error, Grandparents argue that the trial court erred by dismissing their complaint. Specifically, they argue that they proved, by a preponderance of

the evidence, that Mother is unsuitable and that it would be in M.B.'s best interest to award them custody. We agree.

{¶9} Initially, we note that Mother did not file a brief with this Court. Accordingly, "this Court may accept [Grandparents'] statement of the facts and issues as presented in [their] brief as correct and reverse the judgment of the trial court if [their] brief reasonably appears to sustain such action." *Polen Implement, Inc. v. Toth*, 9th Dist. No. 07CA009280, 2008-Ohio-3211, ¶ 8; App.R. 18(C).

{¶10} "A trial court retains broad discretion in child custody matters, and this Court will only reverse the trial court upon a showing of an abuse of discretion." *Lorence v. Goeller*, 9th Dist. No. 04CA008556, 2005-Ohio-2678, ¶ 14. *Accord Ives v. Ives*, 9th Dist. No. 02CA008176, 2003-Ohio-3505, ¶ 17; *Harrold v. Collier*, 9th Dist. No. 02CA0005, 2002-Ohio-3864, ¶ 7. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In a custody determination pursuant to R.C. 2151.23(A)(2), a trial court must determine whether the non-parent has proven, by a preponderance of the evidence, that he or she is entitled to custody. *Ives* at ¶ 19.

{¶11} "[A] juvenile court may adjudicate custodial claims brought by the persons considered nonparents at law." *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 43. *Accord* R.C. 2151.23(A)(2).

> In an R. C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the [court] may not award custody to the nonparent without first making a finding of parental unsuitability that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.

*In re Perales*, 52 Ohio St.2d 89 (1977), syllabus. "The fundamental rights of a parent are effectuated by severely limiting the circumstances under which a parent may be denied custody of their minor children. Therefore, in these instances, there must be a finding of parental unsuitability before child custody can be awarded to a nonparent." (Internal citations omitted.) *Ives*, 2003-Ohio-3505, at ¶ 13.

{¶12} Unsuitability does not "connote * * * some moral or character weakness." *In re Perales* at 99, fn. 12. Rather, unsuitability equates to detriment to the child. *Id.* "When it is detrimental for a child to be in the custody of his or her parent, it is not in the best interest of the child for the parent to have custody and the parent is unsuitable to have custody." *Baker v. Baker*, 113 Ohio App.3d 805, 811 (9th Dist.1996). "'[D]etriment' to a child includes not only the physical and mental effects a custody award may have on a child, but also the emotional and psychological effects as well." *Ives* at ¶ 19.

{¶13} Mother's relationship with Michael was a focal point of the custody hearing. Before Mother and Michael's marriage took place, Mother often left M.B. with Grandparents so that she could be with Michael. Both Grandmother and Carrie Wolfe, an old friend of Mother's, testified that Mother had confessed that Michael had been violent towards her in the past. Further, Mother's sister, Nicole Ringkob, testified that she had observed holes in the wall of one of Mother and Michael's old apartments and that Mother had told her the holes were from a time when "Michael had gotten mad." The two quarreled frequently, and their fights at times extended to Michael's family members. One such fight occurred in November 2009 when Michael's parents were visiting in South Carolina.

{¶14} Grandmother testified that Mother called her at work on November 8, 2009, and told her that everyone in South Carolina was fighting and Michael's father had "threatened to

punch her in the face." Mother stated that M.B. was upset from all the fighting and that she wanted to leave South Carolina with M.B. and her son. Grandparents testified that they drove straight down to South Carolina only to have Mother change her mind by the time they arrived. Mother allowed Grandparents to take M.B., but wanted to stay in South Carolina with the baby to try to repair things with Michael. Mother admitted that she had fought with Michael and his family, but denied that M.B. knew of the incident or that Michael's father threatened to hit her. According to Mother, M.B. was still at school when all the fighting occurred. She also insisted that Michael's father only "threatened to put his hands on [her]," which she considered "huge[ly] differen[t]" than him threatening to punch her. Mother explained that Michael's father "[p]robably" only made that threat because she said she was going to break all of Michael's mother's possessions.

{¶15} Mother, Grandparents, and Michael's mother also engaged in a fight with one another in front of M.B. during the course of this litigation. On April 8, 2010, the trial court issued its initial judgment entry in this matter, dismissing Grandparents' complaint and ordering them to return M.B. to Mother's custody. On April 13, 2010, Grandparents kept M.B. from school and had her in the car with them to run errands. Grandmother testified that, as their car pulled into a parking lot and prepared to stop, "[M.B.] started screaming because someone jerked the back car door open." Mother, Michael's mother, and another individual apparently located Grandparents and decided to take M.B. from them pursuant to the court's order. Michael's mother attempted to unbuckle M.B. from her seat while Grandmother jumped out of the car and tried to close the car door on her. Grandmother testified that Michael's mother then attacked her while Mother grabbed M.B. Grandmother described M.B. as "hysterical" during the incident, and both the police and CSB were called to the scene. Grandparents both testified that once

things in the parking lot calmed down, Mother told M.B. to say goodbye to Grandparents because she would never see them again. She also told Grandparents that they would not be able to visit M.B. because grandparent rights did not exist in South Carolina. Mother admitted at the hearing that she made the statement about grandparent rights not existing in South Carolina, but denied telling M.B. that she would never see Grandparents again.

{¶16} Numerous witnesses testified regarding M.B. Coryne Carlton, a school counselor with Green Local Schools, testified that she conducted both group and individual counseling sessions with M.B. during the 2008-2009 school year. Carlton testified that Grandparents became concerned about M.B. after she began displaying regressive behavior such as sucking her thumb. According to Carlton, M.B. became nervous and fidgety when asked about Michael. M.B. told Carlton that Michael "was mean to her, * * * called her names, [and] cussed at her." Carlton opined that M.B. was afraid of Michael.

{¶17} Cynthia Salwan, a social worker for Akron Family Institute, came to a similar conclusion. Salwan interviewed M.B. in November 2009 after Grandparents brought her back to Ohio from South Carolina. Salwan described M.B. as a bright, articulate girl, but testified that M.B. was afraid for herself and her younger brother. M.B. told Salwan that a lot of arguing and fighting occurred at Mother's home and that she would often take her younger brother and hide when the arguing ensued. At one point, M.B. crawled beneath the table in the playroom Salwan was using for the interview and explained to Salwan that she was demonstrating how well she hid because she "was very good at hiding * * * when there was arguing going on at home." M.B. confirmed that she had observed fighting at her home between Mother, Michael, and Michael's parents. She further indicated that she was glad to be back in Ohio and wished Mother and her brother were here in Ohio because she was very worried about them. Sawlan testified

that M.B. had assumed more of a caretaking role with Mother. According to Salwan, M.B.'s worry and great concern for Mother was detrimental to her own emotional growth and development as she could not focus on her own well-being.

{¶18} Salwan also had the opportunity to ask M.B. about the incident that occurred on April 13, 2010, when Mother tried to take her from Grandparents. Salwan testified that M.B. immediately became quiet when she brought up the incident and started to suck her thumb and cry. Salwan indicated that M.B. had difficulty verbalizing much of what had happened that day and had experienced a certain amount of emotional regression as a result of the incident.

{¶19} Holly Farah acted as the guardian ad litem for M.B. in the custody proceedings and testified as to her observations. Farah indicated that M.B. appeared to be strongly bonded with both Mother and Grandparents, but was adamant that she did not want to live in South Carolina. M.B. described constant fighting and yelling in her South Carolina home and also told Farah that she sometimes hid to try to avoid the arguing. M.B. clearly indicated that she did not want to live with Michael and wished Mother would come back to Ohio. Farah testified that she believed Mother's home environment in South Carolina was chaotic and greatly affected M.B. Farah acknowledged that Mother had made improvements in her life in recent months, including obtaining secure employment, and that Mother appeared to be doing an adequate job caring for her other two children. She ultimately recommended, however, that Grandparents be given custody of M.B., given M.B.'s own expressed preference and all the problems she had experienced in her South Carolina home.

{¶20} Mother herself admitted that M.B. experienced a difficult transition in moving to South Carolina and suffered from both headaches and stomachaches. Although M.B. had participated in numerous activities in her school in Ohio, including basketball and ice skating,

Mother did not enroll M.B. in any activities the entire time she lived in South Carolina. She also did not take M.B. to the doctor to address an eczema flare up that M.B. experienced shortly before her Grandparents came for her. Instead, Grandmother took M.B. to the doctor after bringing her home. She also took her to the eye doctor and, as a result, M.B. was prescribed eyeglasses. Mother testified that she planned to set up an appointment for M.B. to check her vision when she returned to South Carolina, but Grandparents never brought M.B. back. At the time of the June 2011 trial, Mother had only visited M.B. three times since Grandparents brought her back to Ohio in November 2009. Mother was not able to answer any questions at trial about M.B.'s school activities, who some of her friends were, or who her doctor was.

{¶21} Mother denied many of the allegations made at the custody hearing. She denied that M.B. was aware of any fighting in her home or had ever hidden in the home by herself or with her brother due to the fighting. She also denied that she and Michael had an abusive relationship. Mother admitted that she had experienced a problem with cutting herself in her youth, but claimed that several family members who testified that she had done so recently when fighting with Michael were lying. Grandmother and Mother's sister further testified that Mother threatened to kill herself at one point during a particularly bad fight with Michael, indicating that she could not live without him. Mother, however, denied that she was hysterical during the incident.

{¶22} Mother testified at the hearing that she and Michael had legally separated and were in the process of obtaining a divorce. According to Mother, Michael did not live with her anymore and she was going to keep their home and take over the mortgage payments. Even so, Mother stated that she had allowed Michael to sleep on her couch for several days after he was released from jail for some undisclosed incident. She also admitted that Michael had been in her

home several times since their separation because she needed him to watch their two children while she was at work. Mother insisted, however, that Michael was not living in her home.

{¶23} Four days before trial, a private detective hired by Grandparents knocked on the door at Mother's home after observing more than one car in the driveway. Charles Belue testified that Michael answered the door dressed only in shorts. Belue provided Michael with a fabricated story about a lost dog and asked Michael both if he lived there and if he would be there for the next few days. Michael gave an affirmative response to both questions. Additionally, Farah, the guardian ad litem, testified that she did not believe Michael was gone from the home. Farah specified that when she called Mother to speak with her on June 3, 2011, Michael answered the phone.

{¶24} The record is replete with instances of Mother needing help with M.B. Mother frequently relied upon Grandparents for financial support and for M.B.'s medical care in the instances when she did not have any insurance for her. She also relied upon them to take M.B. to school, her activities, and her appointments. Grandparents testified that when Mother was responsible for taking M.B. to school, M.B. was often tardy, missed school altogether, or arrived without her assignments completed. M.B.'s attendance records from September 2008 to March 2009 indicate that there were ten days where M.B. was tardy during that period, three half-day absences, and fourteen full-day absences for a total of twenty-seven days where she was either late or absent. Grandparents also testified that one of the things that moved them to seek custody of M.B. was an assertion from Mother that she and Michael were thinking about homeschooling M.B. in South Carolina.

{¶25} The trial court determined that Grandparents were not entitled to custody because they did not prove Mother's unsuitability. Specifically, the trial court determined that the

majority of M.B.'s problems were related to her difficulty adjusting to South Carolina. The trial court reasoned that a difficult adjustment period was a "normal problem" as was experiencing "some friction" between a child and a new step-parent. The trial court concluded that neither M.B.'s reluctance to move to South Carolina, nor Grandparents' dislike of Michael, could form a basis for a finding of unsuitability.

{¶26} Upon our review of the record, however, we cannot agree that the evidence here only suggests an instance of adjustment difficulty or dislike for a step-parent. Numerous witnesses testified that M.B. had been exposed to a chaotic environment filled with fighting and arguing. M.B. was reduced to the level of hiding in her own home to try to escape the environment that Mother created for her and began to display regressive emotional behavior as a result of some of the traumatic events that she experienced. Despite the fact that Mother's relationship with Michael was perhaps the largest source of stress for M.B. and herself, Mother continued to facilitate a relationship with him. There is evidence that Mother failed to put any of M.B.'s needs first in terms of finding a stable home for her to live, ensuring that she attended school and performed well there, encouraging her to participate in the after-school activities she enjoyed, and making sure she always received the medical care she required. Mother displayed exceedingly poor judgment in several instances, such as when she tried to forcibly take M.B. from Grandparents in the middle of a parking lot, thereby exposing M.B. to an unnecessary confrontation and necessitating the involvement of both the police and CSB. Finally, Mother only visited M.B. three times in the span of a year and a half, and it is unclear how often she even spoke with her during that time period.

{¶27} Given all the evidence in the record, we must conclude that Grandparents proved by a preponderance of the evidence that it would be detrimental for M.B. to be in Mother's

custody. *Baker*, 113 Ohio App.3d at 811. The record contains evidence that M.B. suffered from physical and mental difficulties (headaches and stomachaches) as well as emotional and psychological difficulties (emotional regression and thumb sucking) as a result of living with Mother. *See Ives*, 2003-Ohio-3505, at ¶ 19. There was evidence that Mother and Michael had a verbally abusive relationship that often resulting in arguments that M.B. observed. *See id.* at ¶ 21-23. M.B. worried about Mother and was forced to assert a caretaking role with Mother rather than focus on her own developmental growth. Moreover, there was evidence that Mother often struggled to provide for M.B. Although Mother clearly loves M.B. and M.B. would prefer to be near Mother if the circumstances were different, we must conclude that Mother cannot be a suitable parent for M.B. at this point in her life.

**{¶28}** Perhaps the most troubling part of this proceeding is that, given the evident acrimony as a result of this proceeding, it is easy to lose sight of the person most important here: M.B. In embattling themselves in vicious disputes with one another, M.B. has been exposed to numerous, unhealthy situations and has not been spared from exposure to the parties' respective, negative feelings toward one another. Because Mother will always be a part of M.B.'s life, it is of paramount importance that both Mother and Grandparents facilitate their respective relationships with M.B. in a manner that places her interests first.

**{¶29}** Based on all the foregoing, we reverse the judgment of the trial court and award custody to Grandparents. Grandparents' second assignment of error is sustained.

Assignment of Error Number One

> THE TRIAL COURT ERRED AS A MATTER OF LAW BY RULING THAT EVIDENCE OF APPELLEE'S UNSUITABILITY AROUND THE TIME OF THE FILING OF THE COMPLAINT FOR CUSTODY WAS IRRELEVANT AND THEREFORE INADMISSIBLE.

**{¶30}** In their first assignment of error, Grandparents argue that the trial court erred by not admitting certain testimony on the basis that it was irrelevant to the issue of unsuitability. Given our resolution of their second assignment of error, Grandparents' first assignment of error is moot and we decline to address it. App.R. 12(A)(1)(c).

### III

**{¶31}** Grandparents' second assignment of error is sustained and their first assignment of error is moot. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed, and the cause is remanded for the trial court to enter judgment consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

> BETH WHITMORE
> FOR THE COURT

BELFANCE, J.
CONCURS

DICKINSON, J.
CONCURS IN PART, AND DISSENTS IN PART, SAYING:

**{¶32}** I agree with the majority's evaluation of the evidence that was before the trial court. It is important, however, to recognize that that is what the majority has done. Essentially, it has concluded that the trial court's judgment is against the manifest weight of the evidence, and I agree with that conclusion.

**{¶33}** When an appellate court reverses a jury verdict as being against the manifest weight of the evidence, it must remand for a new trial. *Hanna v. Wagner*, 39 Ohio St. 2d 64, 66 (1974). Rule 12(C) of the Ohio Rules of Appellate Procedure, however, allows an appellate court, when it determines that a judgment entered in a nonjury case is against the manifest weight of the evidence, to reweigh the evidence and enter the judgment the trial court should have entered on that evidence or to remand the case to the trial court for further proceedings. For an appellate court, which did not have the advantage of seeing witnesses firsthand, to reweigh the evidence and enter judgment is a drastic remedy. I don't believe that drastic remedy is appropriate in this case and would remand to the trial court for further proceedings.

APPEARANCES:

JOY S. WAGNER, Attorney at Law, for Appellant.

TRESSA L. SMITH, pro se, Appellee.