[Cite as *In re J.L.C.*, 2024-Ohio-4999.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
CARROLL COUNTY


IN THE MATTERS OF:

J.L.C. AND V.J.C.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 CA 0976**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Carroll County, Ohio
Case No. 20234005

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Kelly Bryan Broadwater,* Broadwater Law, LLC, for Appellees and

*Atty. Daniel Guinn,* Guinn Law Firm, LLC, for Appellant.


Dated: October 16, 2024

**DICKEY, J.**

{¶1}   Appellant, J.J.C. ("Father") appeals the judgment entry of the Carroll County Court of Common Pleas, Juvenile Division, awarding custody of his minor children, J.L.C. (d.o.b. 5/11/2008) (age fifteen at the in camera proceeding) ("Son") and V.J.C. (d.o.b. 6/20/2014) (age 9 at the in camera proceeding) ("Daughter") to Maternal Grandparents, L.M.F. ("Grandmother") and J.L.F. ("Grandfather") (collectively "Grandparents").  Father does not challenge that portion of the judgment entry awarding standard visitation to him, with the caveat that he may not consume alcohol four hours prior to or during visitation.

{¶2}   Appellant advances two assignments of error.  First, he correctly argues the juvenile court erroneously concluded he and S.M.C. ("Mother") were never married. Second, Appellant contends the juvenile court abused its discretion when it sustained Grandparents' motion for custody.

{¶3}   The juvenile court concluded Father was an unsuitable parent, as his alcohol abuse, unwillingness to augment his parenting ability through parenting classes, and refusal to allow Son and Daughter to participate in therapy following Mother's death, had a detrimental effect on his children.  The juvenile court further concluded Father's decision to request intervention by the Sheriff's Department on several occasions when Son misbehaved, and to expel Son from Father's home on August 22, 2023, constituted abandonment of the child. For the following reasons, the judgment entry of the juvenile court is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶4}   Mother and Father were married prior to the birth of the two children that are the subject of this appeal. The couple separated roughly one year after Daughter's birth, and remained separated until Mother succumbed to cancer on November 30, 2021. After Mother and Father separated, Father accepted employment in Virginia and Texas. His subsequent contact with Son and Daughter was sporadic.  According to the GAL's interim report filed on November 7, 2023, Grandmother reported that Father was in child support arrears in the amount of $17,000 when Mother died.

**{¶5}** Immediately following Mother's death, Son and Daughter, who had been living at Grandparents' residence with Mother and her three children from another relationship/other relationships ("half-siblings"), went to live with Father. According to Grandparents, they harbored deep-rooted concern regarding the effect of Father's alcohol consumption on his ability to be a full-time parent, but they did not believe they had sufficient evidence to remove Son and Daughter from Father's custody.

**{¶6}** The respective households require some elaboration. Two of the half-siblings were born during Mother's marriage to Father. Father raised all three of the half-siblings in addition to Son and Daughter prior to the separation. The half-siblings are biracial and continued to reside with Grandparents at the time of the evidentiary hearing.

**{¶7}** Father married A.C., his high school girlfriend, after Mother's death. A.C. has four children from another relationship/other relationships ("A.C.'s children"). After Mother's death, Son and Daughter resided with Father, A.C., and A.C.'s children in a 5-bedroom, 3-bathroom double wide trailer on the outskirts of Dellroy, Ohio, which Father rents from A.C.'s mother.

**{¶8}** Father allowed Grandparents liberal visitation with Son and Daughter for roughly fourteen months following Mother's death. Then, on February 22, 2023, Grandparents filed a petition for visitation, which alleged Father terminated visitation as of January 29, 2023. The petition was resolved through an agreed order filed on March 17, 2023, which awarded visitation with Son and Daughter to Grandparents every other week, as well as certain holidays and the anniversary of Mother's birth and death.

**{¶9}** Three days after Son's ouster from Father's residence on August 22, 2023, which is described in detail below, Grandparents filed the petition for custody of both Son and Daughter currently on appeal, as well as an ex parte petition for emergency temporary custody for both children, which was sustained with respect to Son only on August 28, 2023.

**{¶10}** A Guardian Ad Litem ("GAL") was appointed on September 8, 2023. The GAL requested authority to review the records of Carroll County Job and Family Services ("JFS"), which had opened a file following the incident on August 22, 2023.

**{¶11}** On September 28, 2023, Father filed a motion to terminate Grandparents' visitation. By order of the juvenile court filed on November 8, 2023, which was based on the GAL's interim report filed on November 7, 2023, the parties were granted visitation with their respective non-custodial child and all parties were prohibited from consuming alcohol during visitation.

**{¶12}** The evidentiary hearing on the motions was conducted on January 31, 2024. The juvenile court accepted the testimony of the parties, the GAL, and Father's sister, M.H. The juvenile court conducted in camera interviews with Son and Daughter on February 14, 2024.

**{¶13}** Father testified that he is a heavy equipment operator for Republic Service. He has been consistently employed since the age of eighteen, and employed by Republic Service for two-and-a-half years.

**{¶14}** Father conceded he typically consumed "a couple of beers" when he came home from work, but the volume varied based on "how the day goes." (1/31/24 Hrg. Tr., p. 257.) He denied having a problem with alcohol, explaining he was convicted of driving under the influence when he was eighteen years of age, but has had no issues with alcohol during his adult life. He testified his job has "everything to do with your hands and eyes," and could not be performed by an impaired person. (*Id.*, p. 239.)

**{¶15}** Nonetheless, Father conceded he told JFS that he consumes seven or eight beers per day when JFS interviewed him in August of 2023. Father further conceded that he has transported Son and Daughter in his automobile after he has consumed alcohol, but he warranted that he was not impaired.

**{¶16}** According to Father, he drastically reduced his alcohol consumption following the August 22, 2023 incident. During direct examination, Father testified that "[he] went twenty days without drinking and driving." (*Id.*, p. 240.)

**{¶17}** Father explained he currently consumes alcohol "mainly [on] the weekends" while watching football, and he avoids drinking around the children. At the time of the hearing, he retained custody of Daughter and he testified he drank a couple of beers in his bedroom each night before retiring.

**{¶18}** When asked why he reduced his alcohol intake if he does not believe he has a problem, Father responded, "[b]ecause I don't need my kids to leave me. They need to stay with me. They need a father in their life." (*Id.*, p. 272.)

**{¶19}** Nonetheless, Father admitted at the hearing that he consumed alcohol prior to Son's most recent visit. Father testified Son spent the previous Sunday from 2:00 p.m. to 9:00 p.m. at Father's residence. They watched football and played video games. When Father was asked if he drank after Son left, he responded, "[w]ell I drank before technically." (*Id.*, p. 273.) Father testified that it was "hours" before Son's visit.

**{¶20}** Conversely, Grandparents testified they have known Father for seventeen years and he has consistently abused alcohol. According to Grandmother, Father regularly consumed a twelve-pack of beer, sometimes a twenty-four-pack, at family gatherings in a matter of four hours. Grandfather testified Father averaged four or five beers per hour.

**{¶21}** Grandmother testified Father was intoxicated during roughly half of their telephone conversations about the children following Mother's death. Grandfather testified he could not remember his last sober conversation with Father.

**{¶22}** Grandparents testified Father becomes emotionally abusive when he drinks, engaging in name-calling, slurs, and unfounded accusations, with the intent of hurting other people's feelings. However, Grandmother conceded she had no personal knowledge of Father's drinking after March of 2023, relying instead on Son and Daughter's observations.

**{¶23}** Grandmother testified Father frequently draws Son and Daughter into adult conversations when he is intoxicated. Grandfather recounted a telephone conversation with Father, when Father called Daughter to the telephone and asked, "[a]re you alive? Are you fed? Tell this motherfucker I take care of you." (*Id.*, p. 185.)

**{¶24}** Grandparents both testified Father uses the "N" word within earshot of Son and Daughter, despite the offensiveness of the term, which is magnified by the fact that the half-siblings are biracial. Grandmother confronted Father, who she believed was intoxicated, about his use of the invective during a telephone conversation. Father

explained, "[y]ou can be an N I G G E R if you're white or black, it doesn't matter your color." Grandmother abruptly ended the conversation after Father stated, "I don't have any f---ing N I G G E R S, [sic] here." (*Id.*, p. 156.) On cross-examination, Father denied using the "N" word to describe the half-siblings, but was not asked about general use of the word.

**{¶25}** Grandmother testified Father has encouraged Son to drink alcohol. Father denied coercing Son to imbibe, but conceded he gave Son a beer on the New Year's Eve following Mother's death. Father saw no harm in his conduct because Son did not drink it. The GAL testified Son posted a video to Snapchat in which he picks up a beer from a cooler and opens the can, but does not drink.

**{¶26}** The GAL opined Father has a substance abuse problem, and she recommended custody of Son and Daughter be awarded to Grandparents. She recommended parenting time with Father, with the condition that he may not consume alcohol when the children are in his care. On cross-examination, the GAL was asked why she did not recommend substance abuse treatment for Father if she believes he is sick. The GAL replied, "He's not ready for it." (*Id.*, p. 101.)

**{¶27}** Grandparents' concerns regarding Father's alcohol consumption and his parenting skills were realized on August 22, 2023. The events of that day were recounted at the evidentiary hearing by Father, and M.H. (Father's sister), who was present at the trailer that day. The GAL also offered testimony regarding the events of August 22, 2023. Although she was not present that day, her testimony was based on a police report, which was not offered into evidence.

**{¶28}** According to Father, he arrived home from work and Son was laying on the floor. A.C. informed Father that Son had ignored A.C.'s instruction to remove the garbage from the trailer. A.C. also reported Son had received a detention at school that day.

**{¶29}** Son's refusal to perform the chore was simply the latest in a series of problems Son had caused in the household. Son had previously stolen cigarettes, vapes, credit cards, money, and A.C.'s underwear. In addition, prior to the current problem at

school, Son had been fighting and back talking in class, and was on the verge of expulsion. Further, Son was caught in repeated lies regarding the foregoing conduct.

{¶30} Father asked Son to explain the latest problem at school. In response, Son called Father "every name in the book" then stormed off to his bedroom slamming the bedroom door behind him. In response, Father removed the door from Son's bedroom. Father explained Son had punched the bedroom door so many times that it was in complete disrepair. Father's removal of Son's bedroom door only served to infuriate Son. Son called Father a "fagot [sic] and everything." (Id., p. 235.)

{¶31} Father called the Sheriff's Department. Father admitted he had called the Sheriff's Department three or four times in the past to deal with Son's defiant behavior. The first time Father called the Sheriff's Department, Son had taken some of his belongings and walked out of the house.

{¶32} When asked why he repeatedly resorted to intervention by law enforcement to parent Son, Father explained:

> 'Cuz a couple of times, he's . . . well, he punched two holes in my door, a hole in his wall. He's thrown stuff. He's called me belligerent names. And at that point. I don't know what I am supposed to do. Like you, you can't beat your kids. So, tell the cops and maybe that helps.

(*Id.*, p. 234.)

{¶33} Father asserted the confrontation on August 22, 2023 was the reason he started drinking beer that evening. Father conceded he told Son to get out of the house. On previous occasions when Sheriff's deputies had been summoned, they were able to diffuse the situation between Father and Son. However, Father testified that on August 22, 2023, "[Son] wasn't listening to [Father]. He wasn't listening to the Sheriff. And [Son] always threatens [Father] he's going to go [to Grandparents' house] so . . . if that's what [Son wants] . . . yeah." Rather than permanently expelling Son from Father's home, Father told Son he was welcome to return at any time.

Case No. 24 CA 0976

**{¶34}** M.H. lived at Father's residence for roughly a year and described Father as an "amazing dad," who typically drinks a beer while making dinner for the kids. (*Id.* at p. 208.)  According to M.H., who was present in Father's home in August 22, 2023, Son does not listen and he was the aggressor on August 22, 2023.

**{¶35}** M.H. testified Father did not argue with Son, but simply informed Son that his mobile telephone was going to be taken away as punishment for his misbehavior.  M.H. further testified Father was not intoxicated that evening and that he only consumed alcohol occasionally after August 22, 2023.  However, M.H. conceded on cross-examination that she "probably had way more [alcohol] than [Father] did" on August 22, 2023 and her assessment of his alcohol intake that evening was likely affected by her own alcohol consumption. (*Id.* at p. 222.)

**{¶36}** According to the GAL's interim report filed November 7, 2023, which was based on the police report, Father was drinking a beer when the Sheriff's Deputy arrived at Father's residence at 6:00 p.m. on August 22, 2023, and he continued to drink during the entire encounter.  Father had summoned law enforcement because Son was being "unruly."  Son indicated that he would like to speak to Father about the events of the day, but only after Father regained his sobriety.  Father "got very mad, stating he only had three beers, and told [Son] to 'get the fuck out of [Father's] house.' " (11/7/23 Interim Report., p. 2.)  Father told Son that Father did everything for Son and Son was ungrateful.  The interim report described photographs of Father's home "with empty and full bottles of alcohol throughout the kitchen." (*Id.*)

**{¶37}** Grandmother testified she received a telephone call from Son that evening requesting Grandparents' retrieve Son.  Grandmother "specifically asked [Son], am I coming to get you this time?  Are you guys putting me in the middle of things?" (Hrg. Tr., p. 134.) Grandparents met the Sheriff's Deputy at Dollar General because Father said Grandparents "were not to step on his F...ing property."  According to Grandmother, Father and Son ultimately reconciled in December of 2023 and Son visited Father regularly, in addition to the court-ordered visitation, and without incident due to Father's sobriety during Son's visits.

**{¶38}** By order of the court, Father submitted to a randomly-scheduled toenail/fingernail alcohol screening test on November 8, 2023, roughly eleven weeks after the August 22, 2023 incident. The result was 237 pg/mg. The GAL stated the "cutoff" is 20 pg/mg. Although a copy of the test results was not offered into evidence at the hearing, there is a copy attached to the GAL's interim statement of accounting. The GAL testified Father's result was greater than eleven times the cutoff.

**{¶39}** In addition to Father's alcohol use, the GAL was frustrated with Father's unwillingness to consider assistance in the form of parenting classes for him and therapy for the children. When asked why he had not made any effort to improve his parenting skills, despite requiring the assistance of law enforcement to parent Son, Father responded, "[i]f it makes you feel better, I'm a good parent. I've got five other kids. There's nothing wrong with 'em." (1/31/24 Hrg. Tr., p. 275.)

**{¶40}** Moreover, Father was unimpressed with the results of the children's therapy sessions. Pursuant to a JFS order, Father enrolled Daughter in counseling. He explained at the hearing that Daughter participated in an intake session over the telephone, but at the conclusion of the session the nine-year-old told Father she did not need therapy. Father concurred stating "[t]here's nothing wrong with her. . . She's perfectly fine." (*Id.*, p. 277.)

**{¶41}** John Gorrell is a mental health therapist at Son's school. Son resumed therapy while in Grandparents' temporary custody after Father terminated Son's sessions with Gorrell. Father did not believe Son was benefitting from treatment. Father terminated Son's treatment without any discussion of Son's therapy with Gorrell.

**{¶42}** According to the GAL, Son spends roughly ninety percent of his sessions talking about the loss of Mother, and the remainder of the time addressing his behavioral issues. Further, Gorrell informed the GAL that reuniting Son with all of his siblings would be good for him and "benefit him more than any therapy." Gorrell is currently addressing Son's anger management, emotional regulation, coping skills, and impulsivity. Gorrell believes Son meets the Oppositional Defiant Disorder requirements on paper.

{¶43} Similarly-conflicting testimony was offered regarding Daughter's participation in extra-curricular activities. According to the GAL, Daughter stopped participating in cheerleading due to Father's inability to manage the schedules of six children. Father countered that Daughter did not ask to participate in cheerleading that school year. Daughter did express an interest in Scouts, but Father objected to her participation because it was no longer an all-girls' organization.

{¶44} According to the GAL, Father denied visitation with Grandparents to punish Son. Grandmother similarly described Father's vindictiveness with respect to Grandparents' visitation.

{¶45} However, the most damning information regarding Father's relationship with Son was provided in the GAL's final report filed on January 25, 2024. The oldest half-sibling, R.M., who was seventeen when she was interviewed by the GAL, reported Father was physically abusive to Mother while they were cohabitating and physically abusive to the children. According to R.M., she and Son, when they were around ages five and six, would "dump out Father's beers because they didn't like him drinking." When Father learned of their actions, he "hit [Son] in the face and made his nose bleed, choked him, and slammed him against the wall." (1/25/24 Final Rep., p. 13.) R.M. recalled an occasion when she was between the ages of ten and twelve when Father tore her pants from her body in order to strike her.

{¶46} R.M. recounted a weekend the previous summer when she and her boyfriend were invited to Father's house, only to realize upon arrival that all of the adults were intoxicated. "Father came in and started choking [Son]. [Son's] face turned red and [he] fell off the bed onto the floor." According to the GAL's final report, Father told the GAL that he and Son were just roughhousing, and that R.M. and her boyfriend spent the entire weekend at Father's residence.

{¶47} According to R.M., Mother was concerned about Son's visits to Father's home because Father would "bully" Son and call him names because Son wanted to grow his hair and get an earring. Grandmother's daughter, T.M., reported that Grandmother's

estranged brother, W.H., who is a close friend of Father and has a substance abuse problem, was emotionally abusive to Son and called him "gay."

**{¶48}** R.M. reported Father is violent when he is drunk and frequently incites arguments with the family. He frequently drives while intoxicated. On the other hand, Grandparents are stable, loving, and nice, and do not scream for no reason. R.M. told the GAL that Son and Daughter should reside with Mother's children.

**{¶49}** In the judgment entry on appeal, the juvenile court acknowledged Father was the only surviving parent of Son and Daughter, but opined Father was not "legally presumed to be the custodian," based on the juvenile's court's misapprehension that Father and Mother were not married when Son and Daughter were born. (J.E., p. 3.) Despite the erroneous factual finding, the juvenile court ultimately applied the correct two-part analysis, that is, the parental suitability of Father then the best interest of the children, although the juvenile court undertook the analyses out of order.

**{¶50}** The juvenile court opined Father is "very likely an alcoholic." (*Id.*, p. 4.) In so concluding, the juvenile court discounted Father's assertion that he had reduced his alcohol intake following the incident on August 22, 2023. The juvenile court predicated its conclusion on the results of the nail test, which was administered eleven weeks after the incident on August 22, 2023.

**{¶51}** The juvenile court credited Grandparents' testimony that Father was verbally abusive and physically violent when he is intoxicated, and that he acts without regard to the safety of Son and Daughter, based on Father's concessions that he transports the children in his automobile after drinking a few beers and provided alcohol to Son on New Year's Eve. Further, the juvenile court opined Father does not act in the best interest of his children based on his unilateral decision to terminate their counseling, his refusal to attend parenting classes, and his intractability regarding extracurricular activities for Daughter.

**{¶52}** With respect to parental suitability, the juvenile court concluded Father "on at least three occasions, ordered [Son] to leave the home." (*Id.*, p. 10.) As a

consequence, the juvenile court opined Father's decisions rendered Son "homeless" and "the real and practical effect on [Son] was that he was abandonded." (*Id.*, p. 11.)

**{¶53}** In addition to the constructive abandonment theory, the juvenile court opined that awarding custody to Father would be detrimental to both Son and Daughter. The juvenile court characterized Father's alcohol abuse as a serious problem, which manifested itself in emotional and physical abuse towards Son, and jeopardized both of the children's safety. Although Son was the "direct object of Father's wrath," the juvenile court opined Daughter bears witness to Father's malicious behavior. The juvenile court further observed Daughter "is not yet a teenager and [ ] her time may come." (*Id.*, p. 13.) Based on the in camera proceeding, the juvenile court opined Daughter was "so confused or so fearful that she cannot even talk about [her Father's behavior.] (*Id.*, p. 12.) The juvenile court further predicated its conclusion that Father's custody would be a detriment to Son and Daughter based on Father's confessed practice of transporting the children after he has consumed alcohol.

**{¶54}** Based on Father's conduct when he is intoxicated, that is, his propensity toward cruelty and violence, and his poor judgment and its effect on his children, the juvenile court concluded Father was an unsuitable parent. With respect to the children's best interest, the juvenile court relied on the enumerated factors in R.C. 3109.04(F)(1) to conclude that awarding custody of both children to Grandparents, while allowing visitation with Father, with the condition that he does not consume alcohol before or during visitation, best served Son and Daughter.

**{¶55}** This timely appeal followed.

## ANALYSIS

## ASSIGNMENT OF ERROR NO. 1

**THE COURT ERRED IN STATING THAT THE MOTHER AND THE FATHER WERE NEVER MARRIED.**

**{¶56}** There was no dispute that Father and Mother were married when the children were born and they lived separately roughly one year after Daughter's birth until Mother's death. In other words, the trial court's factual finding that Mother and Father were not married appears to be a mistake of fact rather than a legal conclusion based on facts in the record. Consequently, Appellant's first assignment has merit. Although we agree the juvenile court erred in concluding Mother and Father were not married, we find the error was harmless as it had no impact on the juvenile court's parental suitability and best interest analyses.

**ASSIGNMENT OF ERROR NO. 2**

**THE COURT ERRED IN DETERMINING THAT THE FATHER WAS UNSUITABLE AS A PARENT AND SHOULD NOT HAVE CUSTODY OF HIS CHILDREN.**

**{¶57}** Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 or R.C. 2151.23. *Hunter v. Hunter*, 2023-Ohio-3331, ¶ 64 (7th Dist.). Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out of "any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child . . ." R.C. 3109.04(A). Conversely, R.C. 2151.23(A)(2) vests jurisdiction for custody disputes in the juvenile court for "any child not a ward of another court of the state." Consequently, "a juvenile court may adjudicate custodial claims brought by the persons considered nonparents at law." *In re Bonfield*, 2002-Ohio-6660, ¶ 43. *Accord* R .C. 2151.23(A)(2).

**{¶58}** A trial court has broad discretion in determining custody matters. *Reynolds v. Goll*, 75 Ohio St.3d 121, 124 (1996). Thus, the lower court's suitability and custody determinations are reviewed for an abuse of discretion. *Polhamus v. Robinson*, 2017-Ohio-39, ¶ 15-17. When applying the abuse of discretion standard, the reviewing court is not free to substitute its judgment for that of the lower court. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). A deferential review in a child custody case is appropriate because

the lower court bears witness to the parties' demeanor and attitude, which may not translate to the written record. *Id.* at 419.

**{¶59}** The custody of a child is a "fundamental liberty interest" of a parent. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The right of a parent to rear his own child presents itself in custody proceedings between a parent and a non-parent, as opposed to a custody proceeding between two parents. *In re Perales*, 52 Ohio St.2d 89, 96 (1977).

**{¶60}** Under the suitability test, a parent is unsuitable if he abandoned the child, he contractually relinquished custody of the child, he has become totally incapable of supporting or caring for the child, or an award of custody to him would be detrimental to the child. *Perales* at syllabus. The non-parent must prove unsuitability by a preponderance of the evidence. *Id.*

**{¶61}** The phrase "detrimental to the child" is not defined by the Revised Code. However, we have held that a custodial award to a parent is detrimental to the child where there are "serious problems" with the unsuitable parent. *In re D.D.*, 2017-Ohio-8392, ¶ 17 (7th Dist.), *see also In re C.V.M.*, 2012-Ohio-5514, ¶ 12 (8th Dist.); *In the Matter of R.J.E.*, 2017-Ohio-886 (11th Dist.). " '[D]etriment' to a child includes not only the physical and mental effects a custody award may have on a child, but also the emotional and psychological effects as well." *In re M.B.*, 2012-Ohio-687, ¶ 12 (9th Dist.), quoting *Ives v. Ives*, 2003-Ohio-3505, ¶ 19 (9th Dist.).

**{¶62}** When jurisdiction for the custody proceedings is vested in the juvenile court pursuant to R.C. 2151.23(A)(2), the statute does not explicitly provide a test or standard by which the trial court is to determine custody. Instead, R.C. 2151.23(F)(1) states that "[t]he juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 . . . of the Revised Code."

**{¶63}** R.C. 3109.04(F) provides a list of non-exclusive factors for the trial court to consider in determining the best interest of the child. These factors include:

> (a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section . . . , the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; . . .

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F).

**{¶64}** It is important to note the suitability test has a higher standard than the best interest test. We have previously explained:

Under the best interest test, the court looks for the best situation available to the child and places the child in that situation. The suitability test, on the other hand, requires a detriment to the child be shown before the court takes him/her away from an otherwise suitable parent. Under the suitability test, "[s]imply because one situation or environment is the 'better' situation does not mean the other is detrimental or harmful to the child."

(Internal citations omitted). *In re DeLucia v. West*, 2005-Ohio-6933, ¶ 16 (7th Dist.).

**{¶65}** First, there is a considerable amount of conflicting testimony in the record. Based on the judgment entry, it is clear that the juvenile court found Father's testimony and the testimony offered on his behalf to be wholly incredulous.

**{¶66}** In his second assignment of error, Appellant advances two contentions. First, the juvenile court abused its discretion in concluding Father was not a suitable parent, and second, the children's best interest is served by awarding custody to Father.

**{¶67}** With respect to his suitability as a parent, Father argues Son's behavior, not Father's alcohol consumption, was the catalyst for all of the problems in Father's household. Father further argues Grandparents had no problem with his alcohol consumption until Son expressed his desire to live with them, so they manufactured the problem as an excuse to acquire custody of the children. Father writes, "if Father's use of alcohol was such a concern then [Grandparents] should not have allowed [Son] to have additional parenting time with Father beyond the Court Order." (Appellant's Brf., p. 20.) The foregoing argument ignores Grandmother's testimony that visitation occurred without incident during that time because Father was sober. Finally, Father argues the juvenile court disregarded Daughter's request for equal time in both households. He writes, "[j]ust because [Father] got into an argument with [Son] and told him to leave does not mean he should lose custody of [Daughter]." (*Id.*)

Case No. 24 CA 0976

{¶68} First, Father's effort to blame Son for the disharmony in Father's household is a nonstarter because Son's behavior is Father's responsibility. Father eschewed the opportunity to improve his parenting skills with parenting classes as well as the opportunity to resolve Son's behavioral issues following his mother's death through counseling. Father endowed his nine-year-old daughter with the discretion to terminate her own counseling after one introductory session, adding that there is "nothing wrong" with her.

{¶69} Of greater import and by his own admission, Father's reaction to Son's misbehavior on August 22, 2023 was to drink several beers and call the Sheriff's Department, then to tell Son to "get the fuck out of his house." When confronted with his own behavior, Father's response was that he has five other children and there is "nothing wrong" with them.

{¶70} Next, Father's alcohol consumption directly and negatively impacts his parenting, which he refuses to acknowledge. According to the GAL, R.M. and Son discarded Father's beer because they did not like its effect on Father when they were small children. According to Grandparents, Father's personality becomes aggressive and cruel when he drinks, which has precipitated countless family arguments. Father includes Son and Daughter in adult matters and uses the "N" word within earshot of the children. When Son agreed to discuss the problem on August 22, 2023 with Father when he was sober, Father reacted by telling Son to "get the fuck out of [Father's] house." Significantly, the record reflects Son's relationship with Father was harmonious throughout Father's visitation because Father was prohibited by the juvenile court from consuming alcohol.

{¶71} Further, Father's alcohol abuse has placed the children in physical danger. He conceded to transporting the children in his automobile despite drinking a few beers, but warranted that he was not impaired. As previously stated, the juvenile court, which functions as the finder of fact, did not credit Father's testimony regarding the volume of his drinking.

Case No. 24 CA 0976

**{¶72}** Father's alcohol abuse also negatively impacts Father's decision-making. The GAL observed Father intentionally withheld visitation with Grandparents as a form of punishment for Son despite an agreed order of the juvenile court setting visitation.

**{¶73}** Finally, Father characterized Daughter as the "most lovable child in the house." (1/31/23 Hrg. Tr., p. 244-245.) The juvenile court opined Daughter's inability or unwillingness to express herself likely endears her to Father, but any change in her behavior might make her the next target of her Father's alcohol-fueled anger. While the foregoing argument is speculative, the record clearly establishes Father has jeopardized Daughter's safety by transporting her in his automobile after he has consumed alcohol.

**{¶74}** The record establishes Father's home is chaotic and frequently populated by adults under the influence of alcohol. M.H., who was present at Father's home on August 22, 2023 and acted as his character witness at the hearing, conceded that she probably had "way more" to drink than Father on the evening in question.

**{¶75}** Accordingly, we find Father's alcohol abuse, its impact on his parenting and decision-making, and his refusal to acknowledge said impact, are serious problems and a detriment to both children. Father's alcohol abuse and the alcohol consumption of the adults who frequent his home, jeopardize the children's physical safety and create a chaotic environment that negatively impacts their emotional stability. Father's reliance on the Sheriff's Department as a de facto co-parent, coupled with his refusal to consider outside resources to augment his parenting skills and assist his children in coping with the untimely loss of Mother, demonstrate his unreasonable refusal to recognize his own deficits and limitations. Therefore, we find the juvenile court did not abuse its discretion in finding Father is not a suitable parent for Son and Daughter.

**{¶76}** With respect to the best interest factors, Father argues he is gainfully employed and capable of meeting the children's needs. He writes, "[t]he only argument [Grandparents] presented was that [Father's] use of alcohol affected his ability to parent. However, the evidence overwhelmingly showed that [Father] was able to care and provide for them." (Appellant's Brf., p. 20.)

**{¶77}** While it is clear that Father met the children's basic needs for subsistence, the juvenile court concluded Grandparents were capable of meeting their emotional needs as well. R.M. observed the environment at Grandparents' house is calm and conducive to the children's emotional stability and intellectual growth. On the other hand, Father's house was characterized as a chaotic environment populated by adults who were frequently under the influence of alcohol. The children were transported by adults who had been drinking, Father gave Son alcohol when he was underage, and alcohol was the accelerant that transformed typical child-rearing problems into scenarios that required intervention by a Sheriff's Deputy. While it is true Son bore the brunt of the harsh treatment, the juvenile court observed Daughter was a witness to Son's treatment, and her inability to express herself suggested that she was either unable to emotionally process her experiences in Father's home or afraid to speak against Father and A.C.

**{¶78}** Given the fact that the juvenile court credited the testimony offered in favor of Grandparents' custody, and the record supports the juvenile court's conclusion regarding custody, we find the juvenile court did not abuse its discretion in finding the best interest of both children was served by awarding custody to the Grandparents.

## CONCLUSION

**{¶79}** For the foregoing reasons, the judgment entry of the juvenile court awarding custody of Son and Daughter to Grandparents is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

Case No. 24 CA 0976

_____

For the reasons stated in the Opinion rendered herein, the second assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Carroll County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**